## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JAN H. C. GOODWIN,**
Former Executive Director, New Mexico Educational Retirement Board,

        **Plaintiff,**

**v.**                                  **Case No. 1:21-cv-00483-JHR-KK**

**GOVERNOR MICHELLE LUJAN GRISHAM**,
individually and as Governor of the State of New Mexico;
**STATE OF NEW STATE OF NEW MEXICO**
**OFFICE OF THE GOVERNOR; NEW MEXICO STATE**
**DEPARTMENT OF FINANCE AND ADMINISTRATION (DFA);**
**DEBORAH K. ROMERO**, individually and as Cabinet Secretary
of DFA; **NEW MEXICO STATE RISK MANAGEMENT**
**DIVISION (NMRMD); MARK TYNDALL**, individually and as
Director of NMRMD**; NEW MEXICO EDUCATIONAL RETIREMENT**
**BOARD (NMERB); RUSSELL GOFF,  LARRY MAGID,**
**MARY LOU CAMERON, DONALD DUSZYNSKI, RYAN STEWART** and
**ADAN DELGADO**, **TIM EICHENBERG** and **STEPHANIE M. RODRIGUEZ**
**individually and as Trustees of the NMERB; STEVEN GLUCKSTERN,**
**individually and as former Trustee of the NMERB;** and **YET-TO-BE-IDENTIFIED**
**CO-CONSPIRATORS, ENABLERS AND/OR AGENTS,**

        **Defendants.**

**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE NEW MEXICO FAIR
PAY FOR WOMEN ACT, NMSA 2016, SECTION 28-23-1, *ET SEQ.*; FOR VIOLATION
OF THE EQUAL PAY ACT OF 1963, 29 U.S.C., SECTION 206(d); FOR RELIEF IN
ACCORDANCE WITH THE LILLY LEDBETTER FAIR PAY ACT OF 2009; FOR
GENDER AND RACE DISCRIMINATION and ILLEGAL RETALIATION IN
VIOLATION OF THE UNITED STATES CIVIL RIGHTS ACT OF 1964 and THE NEW
MEXICO HUMAN RIGHTS ACT; FOR AGE DISCRIMINATION IN VIOLATION OF
THE UNITED STATES AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 and
THE NEW MEXICO HUMAN RIGHTS ACT; FOR VIOLATION OF 42 UNITED
STATES CODE, SECTION 1983, and THE FOURTEENTH AMENDMENT TO THE
UNITED STATES CONSTITUTION; FOR VIOLATION OF THE DUE PROCESS,
EQUAL PROTECTION and SEX DISCRIMINATION CLAUSES OF THE NEW
MEXICO CONSTITUTION; FOR VIOLATION OF THE NEW MEXICO
WHISTLEBLOWER PROTECTION ACT; FOR BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING; FOR INTENTIONAL
INTERFERENCE WITH EMPLOYMENT CONTRACT;
FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;
FOR BREACH OF FIDUCIARY DUTY and FOR CIVIL CONSPIRACY**

**COMES NOW** the Plaintiff, Jan H. C. Goodwin, by and through her legal counsel, Merit Bennett, *Esq*., of The Bennett Law Group, LLC, and for her amended complaint against the Defendants, states as follows:

## JURISDICTION

1.      The Plaintiff brings this action pursuant to the United States Constitution, the New Mexico Constitution, the United States Equal Pay Act of 1963, the Lily Ledbetter Fair Pay Act of 2009, the United State Civil Rights Act of 1964, the New Mexico Fair Pay for Women Act, the New Mexico Human Rights Act, the New Mexico Whistleblower Protection Act, the United States Age Discrimination in Employment Act, Section 1983 of Title 42 of the United States Code and New Mexico Contract and Tort Law.

2.      Jurisdiction over the federal claims is proper under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over state law claims, including those arising from the New Mexico Constitution, the New Mexico Fair Pay for Women Act, the New Mexico Human Rights Act, the New Mexico Whistleblower Protection Act and other state tort claims pursuant to 28 U.S.C. § 1367. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff Jan H. C. Goodwin (hereinafter "Plaintiff" or "Ms. Goodwin") is a female over forty (40) years of age (now 61 years old) who was recently forced to terminate her employment (constructively discharged by forced resignation) with the State of New Mexico, *ex rel*. the New Mexico Educational Retirement Board ("NMERB" or "ERB") as its Executive Director, for which position she has been employed since March of 2008.  At all times relevant herein, Ms. Goodwin was a resident of Santa Fe, Santa Fe County, New Mexico

2

4.      Defendant Michelle Lujan Grisham (hereinafter "Governor Lujan Grisham," "Governor" or "Lujan Grisham" or the "State" or "state government" or one of "Defendants") is and was, at all relevant times herein since January 1, 2019, the Governor of the State of New Mexico, acting at all times herein as Governor on behalf of the State of New Mexico and/or individually under color of state law.  Any reference to this Defendant shall also be deemed to be a reference to the Defendant State of New Mexico Office of the Governor.

5.      Defendant State of New Mexico (also herein the "State" or "state government" or one of "Defendants") is the governmental entity employing all other named Defendants whose acts and/or omissions described hereinbelow were accomplished under color of state law and therefore have obligated the State for responsibility and liability for their misconduct, pursuant to the doctrine of *respondeat superior* and pursuant to 42 U.S.C., Section 1983.

6.      Defendant State of New Mexico Office of the Governor (also herein "Office of the Governor," "The Office of the Governor," "Governor," "State of New Mexico" and/or "State") is a New Mexico state governmental entity by and through which the Governor (including Defendant Michelle Lujan Grisham and the governors of preceding administrations) and the Governor's cabinet secretaries exercise the authority and perform the duties of the office of the Governor of the State of New Mexico.  At all times herein, any reference to Governor Lujan Grisham, to the "Governor," to any cabinet secretary or to any other appointee of the Governor shall also be reference to, and shall therefore also bind to the liability established herein, The Office of the Governor as a separate and distinct governmental entity of the State of New Mexico.

7.      Defendant New Mexico Department of Finance and Administration ("DFA" or the "State" or "state government" or one of "Defendants") is a New Mexico state governmental entity

whose acts and/or omission described hereinbelow have obligated the State for responsibility and liability for its misconduct.

8.      Defendant Deborah K. Romero (hereinafter also referred to as "DFA," "Defendant Romero," "Secretary Romero," "DFA Secretary Romero," "cabinet secretary" or one of "Defendants") is currently the Cabinet Secretary of DFA, appointed by, and acting at all times on behalf of, with regard to all related matters herein, Governor Lujan Grisham and/or the State and/or herself under color of state law, whose acts and/or omissions described hereinbelow have obligated DFA and/or the State and/or the Office of the Governor and/or the Governor for full responsibility and liability for Secretary Romero's individual (and/or one or more of the named Defendants' collective) misconduct.

9.      Defendant State of New Mexico Risk Management Division ("NMRMD, "RMD" or the "State" or "state government" or one of "Defendants") is a New Mexico state governmental entity whose acts and/or omission described hereinbelow have obligated the State for responsibility and liability for its misconduct.  Defendant Mark Tyndall (also referred to as "NMRMD," "RMD," the "State," "Defendant Tyndall" or one of "Defendants") is the Director of RMD and at all times herein was acting under color of state law and breached the duty he and NMRMD owed to Plaintiff by failing to intervene and prevent and/or correct the harm being inflicted upon Plaintiff as is described hereinbelow.

10.     Defendant New Mexico Educational Retirement Board (hereinafter "NMERB" or "ERB" or the "State" or one of "Defendants") is a New Mexico state governmental agency which administers the retirement investment portfolio of New Mexico state teachers, school administrators

4

and school employees and is also included as a defendant herein to, among other things, insure the enforceability of any judgement awarded to Plaintiff.

11.     Defendants Steven Gluckstern (former Trustee), Russell Goff, Larry Magid, Mary Lou Cameron, Donald Duszynski, Ryan Stewart, Adan Delgado, Tim Eichenberg and Stephanie M. Rodriguez (hereinafter individually and collectively also referred to as "Defendants" or "NMERB" or "ERB" or "NMERB Trustees" or "NMERB Board Trustees" or "Board Trustees" or "Trustees") are former and current members of the Board of Trustees of NMERB and, at all times and for all matters referenced hereinbelow, were acting at all times on behalf of themselves (and/or their predecessors), NMERB and/or the State of New Mexico, under color of state law.

12.     Defendants State of New Mexico, Office of the Governor, DFA, RMD and NMERB are separate and distinct entities/offices/agencies of the government of the State of New Mexico, each with the power to recommend, approve, deny, adjust and/or influence the amount of compensation paid to the Executive Director of the NMERB, *i.e.*, to Plaintiff herein Jan Goodwin, and at issue herein is the failure of one or more or all of these entities/offices/agencies to afford Ms. Goodwin pay equal to that paid to her male counterpart for her equal work.

13.     Defendants Yet-to-be-identified Co-conspirators, Enablers and/or Agents are those individuals and/or state agencies who may have engaged in, enabled and/or facilitated the accomplishment of, any of the misconduct described below, either unilaterally or acting as an agent of another named Defendant, which caused Plaintiff to suffer the harm or damage described. Any reference to "Defendant" or "Defendants" also includes reference to these other yet-to-be-identified individual actors and/or agents and/or enablers and/or co-conspirators of one or more or all of the named Defendants.

**ESSENTIAL FACTS**

**Plaintiff Jan H. C. Goodwin:**

14.     Ms. Goodwin is, among her other educational degrees, professional certifications and other accomplishments, a Certified Public Accountant and a Member of the American Institute of Certified Public Accountants, with a Bachelor's Degree in Environmental Science (Wesleyan University), a Master's Degrees in Business Administration (New York University), and a Master's Degree in Health Administration (University of New Mexico), with certifications as a Certified Employee Benefits Specialist (International Foundation of Employee Benefit Plans) and Certified with the Information Techology Infrastructure Library (ITIL) Foundation.  *See*  Plaintiff's *curriculum vitae* attached hereto as **Exhibit A**.

15.     Ms. Goodwin was born in Albany, New York, and her first consequential employment was with Coopers & Lybrand in New York City (1985-1993), before it merged with Price Waterhouse, as a Senior Associate (Financial Advisory Services) and Supervisor (Personal Financial Services).  She then became Vice President and an Investment Analyst/Compliance Officer with Arbor Capital Partners in New York City (1993-1994).

16.     In 1993, Ms. Goodwin met her husband, who was a resident of Santa Fe,  and married in 1994, becoming herself a resident of Santa Fe.

17.     From 1994 to 1996, Ms. Goodwin served as a Senior Consultant for Summit Equity, Inc., in Santa Fe and in London, England.

18.     Ms. Goodwin was employed as the Cash Management and Investment Officer for the City of Santa Fe from 1996 to 1998.

19.     Ms. Goodwin was first employed with the State of New Mexico as the Deputy Director of the State Investment Council in 1998, accountable for the financial, administrative and information technology functions of the agency managing and investing New Mexico's permanent endowment funds, for the preparation of investment accounting reports of the State Investment Council and external clients and to establish and maintain effective controls to safeguard managed funds.

20.     In 2000, Ms. Goodwin was appointed to the position of the Director for the State Board of Finance, where she administered the State of New Mexico's major severance tax bonds and general obligation bond programs.  She also directed the work of numerous external economists and professionals, including attorneys, financial advisors and economic consultants. She also directed the research for all matters to be brought before the State Board of Finance, including such topics as new programs for state universities, major real estate purchases and sales by public entities, major construction contracts for state entities, awarding emergency grant money and issuing of debt by state agencies and institutions of higher education, all in order to brief the Board members on the specifics of each of the transactions requiring their approval.

During the performance of these duties, Ms. Goodwin uncovered unusual patterns of investment transactions at the State Treasurer's Office, many of which violated the State Treasurer's investment policy, and forwarded her findings to the Federal Bureau of Investigation (FBI) for further investigation, thereby preventing the State and its citizen taxpayers from wasting millions of dollars investing in corrupt transactions and practices.

Ms. Goodwin also provided oversight to the State Treasurer's office responsible for the investment of $4 billion, including the State general fund, bond proceeds and the local government investment pool.

21.     Because of her unsurpassed education, experience and acumen, and her committed service to and her extraordinary beneficial performance for the citizens of our state,  Ms. Goodwin was appointed by Governor-Elect Bill Richardson to be Cabinet Secretary for Taxation and Revenue in December of 2002, and began serving in that capacity January 1, 2003.  She was responsible for collecting and distributing over $7 billion annually in taxes and fees to state and local governments, with approximately 1,200 employees and 60 offices across the state.  She was responsible and accountable for the agency's $84 million operating budget.  She was the first Cabinet Secretary in many years in New Mexico to make on-site visits to all 60 department offices across the state.

Ms. Goodwin's extraordinary service to the citizens of our state resulted in many tangible benefits to the public at large, including, but not limited to:

-  Reducing the average wait time at motor vehicle offices across the state by more than 50% (from 30 minutes to 14 minutes), by launching strategic, multi-faceted campaigns, encouraging the public to complete their need for services online via the DMV website, installing self-service kiosks in every MVD office and installing greeters to ensure that customers had completed all required paperwork to process their desired transactions.

- Overseeing implementation of software for 28 tax programs which replaced the former system, in order to allow for more accurate tax revenue collection, refunds and distribution.

-  Cutting the state's uninsured driver rate from one of the highest in the U.S. (at 32%) to less than the national average (at 12%), thus funding protection for our citizens injured by the negligence of uninsured motorists throughout our state.

- Executing a new initiative designed to improve delinquent tax collections, collecting a total of $395 million (58% above the $250 million baseline), in order for the state to be better able to fund essential services for all of its citizens.

8

- Improving the formerly contentious relationship between the State's Tax Department and the State's Society of Certified Public Accountants by establishing a dedicated customer service line with the audit and compliance division (tax practitioner's hotline) and by conducting regular outreach meetings, so that the state's tax accounting practitioners could better serve the general public and provide them with the maximum available tax benefit at the minimum legal tax rate.

- Eliminating the conditions that caused the qualified audit opinions on the department's financial statements which had existed for more than 15 years, thereby providing more clear accountability to our citizen taxpayers for the expenditure of their tax dollars.

**Illegal Pay Disparity:**

22.     In March of 2008, Ms. Goodwin, then 48 years old, was appointed to serve as the Executive Director of the Educational Retirement Board for the State of New Mexico ("NMERB").

23.     It was Ms. Goodwin's job to secure the funding for the retirement of all of the public school teachers of New Mexico who dedicated their lives to the education of our elementary, high school and state college youth. Her expertise and dedication to this work over the last 13 years has insured that our state's education retirement fund was always profitable and secure.

24.     Her appointment was unfortunately marred by the fact that she was to be paid an annual salary approximately $13,000.00 less than that of her male counterpart, then Executive Director of the New Mexico Public Employees Retirement Association ("PERA") Mr. Terry Slattery, who was then approximately 10 years older than Ms. Goodwin.  These two jobs required equal skill, effort and responsibility and were both performed under similar working conditions. There were no differences between these two job positions because of a seniority system.

25.     In August of 2009, Ms. Goodwin's annual salary was finally increased to an amount comparable to that paid to Mr. Slattery, an acknowledgment by the Defendants that she had not been receiving pay equal to that paid to her male counterpart, that such pay disparity was illegal and that

the illegal disparity required correction.  Despite this acknowledgment, Ms. Goodwin's deficient back pay was not addressed by the Defendants, nor corrected by payment of the difference for which she should have received for those 18 months.  Since that time until the present, such pay disparity, which has continually manifested, in varying degrees, in Ms. Goodwin's unequal compensation for work she was performing equal to that of her male peers, has been continuous and ongoing and constitutes accumulating violations of state and federal anti-discrimination and equal pay laws which prohibit such pattern and practice of institutional and systemic gender, age and race discrimination directed at Ms. Goodwin since from, at the very least, March of 2008; and therefore, because the disparity in her pay has never been consistently corrected and still exists to the date of Ms. Goodwin's recent forced termination, Ms. Goodwin is now entitled to receive payment in an amount reflecting the total accumulation of any such illegally-withheld differential paycheck amounts, together with statutory interest accruing from the date each of such differential amounts were illegally unpaid.

26.     In April of 2010, Mr. Steven Moise was hired as the New Mexico State Investment Council's (NMSIC's) Senior Investment Officer, **to be paid an annual salary of over $100,000.00 more than that paid to Ms. Goodwin as Executive Director of the NMERB**.  These two jobs require equal skill, effort and responsibility and were both performed under similar working conditions.  There were no differences between these two job positions because of a seniority system. Notwithstanding this enormous, unconscionable and obviously illegal disparity, Ms. Goodwin's salary was not increased by Governors Richardson, Martinez nor Lujan Grisham, nor by DFA, RMD, NMERB nor NMERB's Trustees, to match that of Mr. Moise, a male approximately 10 years older than Ms. Goodwin, despite the fact that their two jobs required equal skill, equal

effort and equal responsibility and were performed under similar working conditions and that there were no differences between these two job positions because of any seniority system.

27.     In fact, at the time of his appointment, Mr. Moise did not have the professional experience required by New Mexico statute ("at least [five (at that time)] years of investment and executive experience to direct the work of the investment office" - *see* NMSA 1978, Section 6-8-4) in order to qualify him for employment as the state's chief investment officer - to be able to even assume the position, but his illegal appointment was nevertheless accomplished by then Governor Bill Richardson and was duly ignored by Governor Martinez throughout her tenure and by Defendant Governor Lujan Grisham upon her taking office.  **(Defendant Lujan Grisham, and by implication all Defendants, was/were formally requested to cure the enormous pay disparity between Mr. Moise and Ms. Goodwin, and all Defendants knew that Ms. Goodwin was clearly more qualified than Mr. Moise and had consistently produced better results for the educational employees of the State of New Mexico than had Mr. Moise, under the scrutiny of any reasonable comparative analysis.  *Again see* Plaintiff's *curriculum vitae* attached as Exhibit A and paragraphs 21-23 of this Complaint, *infra*.)**

28.     It is important to note that Mr. Moise <u>only</u> oversees the management of investment portfolios, while Ms. Goodwin not only oversees the management of investment portfolios, she also performs retirement plan administration providing financial security for all of the public education employees within the State of New Mexico in their retirement.

29.     **When comparing the accomplishments of the two agencies overseen by Ms. Goodwin and Mr. Moise, it becomes crystal clear that the work performed by Ms. Goodwin is more complex, more demanding, requires more competence and overall has produced equal**

or better results for the state of New Mexico and for ERB's state employee constituents. *See Comparison of the Service and Performance of the NM State Investment Council Under Steven Moise Measured Against the Performance of the NM Educational Retirement Board Under Jan Goodwin*, attached hereto and incorporated herein as **Exhibit B**.

30. **And finally, NMERB, under the management of Ms. Goodwin, has consistently outperformed the State Investment Council while the NMSIC has been under the management of Mr. Moise.**

- Ms. Goodwin has successfully led three legislative initiatives to increase ERB's sustainability and increase equity among plan members.

- Ms. Goodwin has significantly increased the use of cost-effective investment strategies, including internal management of investments, saving tens of millions of dollars every year she has been in office.

- Ms. Goodwin commissioned a report by the University of New Mexico's Bureau of Economic Research to document and quantify the disparity in the salaries and pension benefits of the state's educational employees (predominately female) with those of other state employees (until recently, predominately male) over time.

- Ms. Goodwin has implemented numerous policies to improve transparency in financial reporting.

*See also* the *Legislative Finance Committee Investment Report For the Quarter Ending June 30, 2018*, attached as **Exhibit C**. (**"When compared with peer funds greater than $1 billion on a net-of-fee basis, the ERB fund [under the direction of Plaintiff Ms. Goodwin] performed in the highest quartile for the quarter, three-year, and ten-year periods, and it performed above the median for the one-year and five-year periods."** *Id.*, at p. 1.)

*See also New Mexico Legislative Finance Committee, Legislating for Results: Policy and Performance Analysis; Report to the Fifty-Fourth Legislature, Second Session, Volume I*, attached

as **Exhibit D**. (**"The ERB pension fund was the only one of the state's investments to perform above the median for all periods reported."** *Id*., at p. 21.)

31.     That this illegal pay disparity between Mr. Moise and Ms. Goodwin has been publicly and privately exposed and known by the administrations of Governors Richardson, Martinez and Lujan Grisham (and by DFA and NMERB, and their respective Secretaries/Trustees) to continue to exist is truly outrageous, not only because Mr. Moise's original appointment was illegal because of his lack of qualification (and remains illegal notwithstanding the passage of time), but also because Ms. Goodwin is demonstrably more qualified and deserving than Mr. Moise, in terms of education, experience and on-the-job performance. **It appears that the current Governor and other named Defendants are giving discriminatory deference to Mr. Moise and concomitant disparagement to Ms. Goodwin because Mr. Moise is an older male, because Ms. Goodwin is a younger female close to the age of the Governor and because Ms. Goodwin is a Caucasian female, while the Governor is a Hispanic female who, by statute, is paid far less than Ms. Goodwin (thus also infusing the discrimination being perpetrated against Ms. Goodwin with a racially-motivated bias).**

32.     Accordingly, the reason for this discriminatory pay disparity can only be attributed to illegally prohibited discrimination based upon race and/or gender and/or age.

33.     **And, in any event, even in the absence of any proof of any illegal discriminatory intent (although such proof is considerable, and compelling), the single fact that Ms. Goodwin is not being paid equal pay for equal work establishes that there are clear and incontestable violations of the New Mexico Fair Pay For Women Act, NMSA 2016, Section 28-23-1, *et seq*.,**

and the Equal Pay Act of 1963, 29 U.S.C., Section 206(d), *neither of which Acts require proof of a discriminatory intent - only proof that the pay disparity exists*.

34.   In fact, the Defendants have tacitly and openly admitted the existence of this illegal disparity for the last five years, yet continued to discriminate against and underpay Plaintiff over the years of her employment with the State, notwithstanding, and likely also in retaliation for, Plaintiff's ongoing complaints of unequal pay and her continual efforts to have the State correct the disparity.

A.   **On June 24, 2016, the Defendant Educational Retirement Board duly voted and approved an increase in Plaintiff's salary, to be phased in over three years, to attempt to narrow the illegal pay gap she had been experiencing vis-a-vis Mr. Moise, which increase was never implemented by the New Mexico Department of Finance and Administration ("DFA") at the direction of then Governor Susana Martinez.** This increase in Plaintiff's salary would have moved her pay level from the bottom of the fourth (lowest) quartile to that of the median range for other directors of similarly-sized United States public pension plans.

B.   **On December 8, 2017, and on May 3, 2018, the NMERB again voted to increase Plaintiff's salary to almost correct the disparity (this vote was a protected complaint of discrimination (hereinafter "protected complaint") made on behalf of Plaintiff), and both efforts were again illegally "vetoed" by Governor Martinez via DFA (retaliation against Plaintiff for this protected complaint), without any citation to any authority she might have to do so (because no such authority exists).** *See* letter dated April 25, 2018, from Mary Lou Cameron, Chair of the Board of Trustees, New Mexico Educational Retirement Board, addressed to Duffy Rodriguez, Cabinet Secretary for the New Mexico Department of Finance and Administration (DFA), pointing out DFA's illegal failure to implement the equalization of Ms.

14

Goodwin's pay and advising that there was no legal basis for such discriminatory inaction (another protected complaint made on behalf of Plaintiff), attached as **Exhibit E**.

> **... [T]he [ERB] Board maintains that any effort by DFA [*ex. rel* the Governor] or its employees to veto, undo or override the decisions and actions of the [ERB] Board on salaries [including that of Jan Goodwin] is unlawful and invalid.** *Id*., at page 2. Emphasis supplied.

C.    **On May 24, 2018, the NMERB once again voted to increase Plaintiff's salary to almost correct the disparity and notified DFA to implement this increase (another protected complaint)**. *See* **Exhibit F**.  (None of these efforts initiated by NMERB (6/24/2016, 12/8/2017. 5/3/2018 and in 2019) either addressed or required that Ms. Goodwin's historical pay disparity be addressed and compensated.)

D.    **In early 2019, after Defendant Lujan Grisham took office, the NMERB resubmitted the ERB Board-approved paperwork to increase Plaintiff's salary to be "almost equal" to that of Mr. Moise (another protected complaint), and DFA was this time instructed by Defendant Governor Lujan Grisham <u>not</u> to implement the <u>46% raise</u> necessary to almost afford Ms. Goodwin with pay equal to her male counterpart, Mr. Moise (retaliation for this protected complaint).** (<u>Only a 5% pay raise was implemented</u> on May 8, 2019, ostensibly at the direction of Defendant Lujan Grisham by which she clearly acknowledged the scale of the pay disparity, but no other efforts to eliminate this illegal pay disparity have since been initiated, undertaken or approved by the Governor or DFA to date (ongoing retaliation for this protected complaint).

In fact, when the 5% raise was approved, the Governor/DFA also increased Ms. Goodwin's salary pay range to be in the same salary pay range of Mr. Moise, yet, even with the 5% raise, Ms. Goodwin's actual salary was not even enough to be greater than the lowest salary in the pay range

that she had just been approved for!  And therefore the glaring pay disparity was known to all Defendants.

E.    **Mr. Moise himself has admitted that Ms. Goodwin should be paid equal to him.** **Mr. Moise confessed to Mr. Charles Wollmann, Director of Communications, Legislative and Client Relations, New Mexico State Investment Council, that when he [Mr. Moise] was asked in May of 2019 by John Bingaman, Governor Lujan Grisham's Chief of Staff, if Ms. Goodwin's salary should be increased to a level virtually equal to the salary paid to Mr. Moise, Mr. Moise replied to Mr. Bingaman by stating that Ms. Goodwin's salary should indeed be increased to an amount virtually equivalent to his salary, thus admitting that Ms. Goodwin's job was essentially, and at the very least,  "equal" to that of Mr. Moise (that both of their jobs required equal skill, effort and responsibility and were performed under similar working conditions), requiring that there be an immediate upward adjustment of Ms. Goodwin's salary to insure that Ms. Goodwin received pay equal to that of Mr. Moise in accordance with state and federal law.**

F.    **In an email dated November 29, 2020, from Mark Baker, then attorney for the NMERB, addressed to General Counsel for Defendant Lujan Grisham, Matt Garcia, on behalf of NMERB and Plaintiff, Mr. Baker urged Mr. Garcia to advise Defendant Lujan Grisham to not block the duly and legally approved pay raise for Plaintiff which was approved and passed by the NMERB Board, because "I [Mr. Baker] view the ERB's status as a constitutionally-created board with an independent fiduciary duty to administer the educational retirement fund, along with the fact that everyone is paid through ERB funds rather than general fund money, as compelling reasons to look at this differently than other**

16

salary determinations ... **I also see some disparities across the State's three major funds – SIC, PERA, and ERB, that warrant scrutiny**." *See* email dated November 29, 2020, from Mark Baker, attached as **Exhibit G**. Emphasis supplied. This email, along with other verbal and written communications emanating from Plaintiff and representatives of the ERB, constituted protected complaints of illegal discrimination made to Defendants for and on behalf of Plaintiff.

**Despite this clear advice - and unequivocal warnings (protected complaints), the Defendant Governor and the other Defendants nevertheless retaliated against Plaintiff by continuing to refuse to permit Ms. Goodwin to be paid equal to her equivalent counterpart, Mr. Moise, in direct violation of state and federal anti-discrimination and equal pay laws.** In fact, Defendant Governor Lujan Grisham exerted this illegal power over the independent NMERB Board in the absence of any clear legal authority to do so, with the sole intent to discriminate against Ms. Goodwin and deny her pay equal to that of her male counterpart because Ms. Goodwin is an older, Caucasian woman.

**NMERB Files Lawsuit:**

G.      **Because Governor Lujan Grisham was conspiring with DFA to block pay raises authorized by NMERB for its senior officials, including Plaintiff, and because the Governor refused to cease her openly illegal misconduct, the NMERB was forced to file an extra-ordinary intra-agency lawsuit on February 22, 2021, against Defendant Romero and DFA, seeking declaratory relief to attempt to cure (not totally but, at least, substantially) this illegal, and constitutionally impermissible, misconduct.** *See* **the Complaint filed by the NMERB attached hereto as Exhibit H. (Hereinafter "NMERB Complaint")**

17

The NMERB Complaint does not address the civil rights issues raised herein, nor does it accurately calculate the relevant pay disparity existing between Plaintiff and Mr. Moise, nor does it seek retroactive correction of the pay disparity to its full legal extent, but it nevertheless constitutes a tacit protected complaint of gender and age discrimination made on behalf of Plaintiff, and other similarly-situated and underpaid female NMERB employees, and it constitutes incontrovertible evidence that the current administration's continued retaliatory defiance of any legal restraint on its power, to include its blatant rejection of its obligation to adhere to fundamental equal rights laws, is likely commonplace throughout this administration and is therefore perniciously arrogant and tortiously illegal.

> NMERB must compensate professional staff [including Plaintiff] at competitive levels given the size of the fund, the sophistication required to competently manage and invest it, and national competition in the public and private sector for individuals qualified to do this work.  NMERB Complaint, **Exhibit H**, at p. 3, para. 11.

> The Board has sole authority to employ the Director [Plaintiff], who is the administrative officer for the Board [and to establish her salary] charged with carrying out the provisions of the Educational Retirement Act and who has additional duties provided for by regulation.  Moreover, the Legislature has specified that '[t]he amount of salaries and fees to be paid by the board [to Plaintiff] shall be fixed by the regulations of the board.  NMSA 1978, Section 22-11-10(A).'  *Id*., at p. 3, para. 13.

> In accordance with its authority and responsibility, the Board adopted regulations providing that the Director [Plaintiff] serves 'at the pleasure of the board and at a salary to be set by the board ... 2.82.1.13 NMAC.'  *Id.*, at p. 3, para. 14

> **The Governor does not have authority to interfere with the [NMERB] Board's fiduciary obligations, including the Board's determinations regarding appropriate salaries to pay NMERB staff [such as Plaintiff].** As a result, DFA never should have submitted NMERB salary increases to the Governor's office for approval, and directives from the Governor's office related to NMERB staff compensation [including denial of pay equity for Plaintiff, retroactively and prospectively] are not a basis for changing Board-approved decisions.  *Id*., at pp. 10-11, para. 58.  Emphasis supplied.

18

Plaintiff Jan Goodwin is specifically referred to in the NMERB Complaint as "Professional Staff Member 3."  *See* **Exhibit H**, paras. 34-39, pp. 7-8.

In particular:

> Para. 38.    **DFA's [illegal and discriminatory] failure to implement [NMERB]Board approved salary increases for Professional Staff Member 3 [Plaintiff Jan Goodwin] resulted in Professional Staff Member 3 [Plaintiff Jan Goodwin] being underpaid by a total of $202,696.33.** [This amount is less than, and does not account for, the total of the illegal disparity in pay (and lost benefits) accruing since Plaintiff's appointment to serve as Director of NMERB, when compared to the salary paid to her equal pay/equal work equivalent, Steven Moise] *Id.*, at p. 7.  Emphasis supplied.

> Para. 39.   Having served in New Mexico government with distinction for decades, Professional Staff Member 3 [Plaintiff Jan Goodwin] was prepared to take a higher-paying position with a public retirement fund outside New Mexico in March 2016. When the Board [NMERB] learned that Professional Staff Member 3 [Plaintiff Jan Goodwin] was being recruited for that position, Board members secured Professional Staff Member 3's [Plaintiff Jan Goodwin's] agreement to remain at NMERB based on assurances that the Board would take care of the [illegal and discrimnatory] compensation discrepancy.  *Id.*

H.     **In fact, Defendants Lujan Grisham and DFA Secretary Romero (who only recently assumed office) and/or one or more of the other individual Defendants, singly or in concert, and/or NMERB (if permitted by the Governor and DFA to exercise its authority) could have immediately acted to correct the disparities referred to in the NMERB Complaint, including the larger equal pay disparity claimed by Plaintiff herein, <u>with a single stroke of the pen</u>, but she/they did not do so, and she/they continued to fail to do so, because all of them (State of New Mexico, DFA and all named individual Defendants, acting under color of state law), except for NMERB and its Trustees, willingly joined the conspiracy with Defendant Lujan Grisham to muzzle pay equity in our state  -  specifically with regard to Ms. Goodwin, thus ultimately forcing Ms. Goodwin to leave her employment with the State of New Mexico**

**and move to another state in order to be compensated at the rate of pay which she deserved for all of the many years of exemplary service she has delivered to the citizens of our state, including especially our public school teachers, administrators and other employees who ensure the safe and wholesome education of our children.**

It also was the duty of Defendants NMRMD and Mark Tyndall and RMD to pro-actively, preemptively and retroactively assess, avoid and avert risks to state government such as those posed by the illegal misconduct described throughout this Complaint, and yet these particular Defendants also abjectly failed to advise the other Defendants of such risks or otherwise take action to insure that such risks did not materialize in the form of the illegal harm ultimately inflicted upon Ms. Goodwin  as is set forth hereinabove, especially after the NMERB Complaint was filed in March of 2021.

The Governor's and her administration's silence in the face of the NMERB Complaint constitutes a tacit admission by the Governor and her administration that they were deliberately violating the New Mexico Fair Pay for Women Act and committing the other violations alleged throughout this Complaint, yet the Governor instead abrogated her responsibilities to the citizens of our state, knowing that her conduct in doing so was illegal, and even immoral, and would consequently result in grave financial, emotional and professional harm to the Plaintiff and would cause Plaintiff to resign her position with state government and leave her home state of NM to find employment elsewhere.  The Governor perpetrated this illegality also knowing that it would result in financial harm to our state's public school teachers and administrators.

When the Governor, Defendant Romero and Defendant Tyndall and the other Defendants all breached their duty(ies) owed to Plaintiff to ensure that Plaintiff was paid equal pay for her work

20

which was equal to that performed by male state employees, such as Mr. Moise, by failing to immediately correct Ms. Goodwin's multi-year pay disparity after being served with the NMERB Complaint (**Exhibit H**) (more retaliation for the protected complaints, included those embodied in the NMERB Complaint), Ms. Goodwin then knew that she was being forced to resign (constructively discharged - forced termination) her employment with the State of New Mexico in retaliation for her protected complaints, because her home state government, while under the control of the complicit individual Defendants, had no intention of ever curing the pay disparity that she had endured for all of the years she served our citizens, and she therefore was compelled to accept the offer of employment from New Hampshire, which provided her with a starting salary virtually equal to that offered to men of equal qualifications throughout the United States, to include Mr. Moise in New Mexico.

This slow-moving tragedy should be unacceptable to any citizen of our state as it sets a horrible precedent for the financial well-being of all hard-working women in our state who deserve to be paid equal to men who perform equal work, and a warning message should be sent far and wide by the jury hearing this case that such blatant, pervasive and institutional mistreatment of highly-educated and highly-qualified female administrators, especially such as Ms. Goodwin, should be rectified to the full economic and legal extent possible - punctuated by an additional award of treble damages as is mandated by the New Mexico Fair Pay for Women Act in order to punish discriminating offenders and to send a strong message to our institutions and businesses that the historical gender pay disparities that pervade across our state must immediately cease.

35. Not only was Ms. Goodwin deliberately forced by the Defendants to seek employment in another state because the Defendants refused to pay her at a rate equal to that of her

21

male counterpart, Mr. Moise, Ms. Goodwin has also been forced to be physically separated across the country from her husband and two adult sons who all had to stay behind in New Mexico when Ms. Goodwin left to begin her new job in New Hampshire, which forced separation has understandably inflicted severe and undeserved emotional distress on the whole family, especially during the COVID-19 pandemic.   The Defendants, individually and altogether, bear the full responsibility for this foreseeable consequence of their unlawful, outrageous and frankly senseless mistreatment of Ms. Goodwin, and all of them must be held fully accountable for this cold-hearted and patently illegal misconduct.  (The NMERB and its Trustees were the only Defendants who made a good faith, albeit inadequate, effort to substantially correct the pay disparity.)

36.     It might be understandable that the Governor's better (and legal) angels have been missing in action, because the Governor herself is being underpaid.  In 2019, a Biz Journal (The Business Journals) study showed that Governor Lujan Grisham was paid a base annual salary of only $110,000.00 by the State of New Mexico, which makes her the 39th-highest-paid governor in the country and the 487th-highest-paid New Mexico state employee.  For all of the extraordinary work and leadership the Governor performs for our state and the incalculable benefit she usually brings to our fellow citizens, this gross underpayment is totally unacceptable, just as is the failure to equally compensate one of our pre-eminent New Mexico public servants, Plaintiff Jan Goodwin.

**Yet, because Defendant Lujan Grisham knew that she would never herself be paid equal to this white woman of the same age (Plaintiff Ms. Goodwin), the Governor (beset by this trifecta of race, gender and age discriminatory animus) unfortunately and illegally refused, in conspiracy with Defendant Romero (a younger Hispanic female) and others yet to be**

**identified, to permit Ms. Goodwin to be paid equal to her male counterpart, Mr. Moise, for the equal (and even more) work that Ms. Goodwin was performing for our state.**

(The undersigned counsel for Plaintiff contends that the New Mexico Fair Pay For Women Act and the federal Equal Pay Act of 1963 both prohibit such a disparity and that Governor Lujan Grisham herself could assert a claim against the State of New Mexico for equal pay, because, as she is the uniquely pre-eminent "employee" in the state, there are no other state employees who could possibly be deemed to be performing "equal work;" and, therefore, the Governor is entitled to demand pay equal to that of her better-paid counterparts in other states. She should not have to seek ways to expense food and clothing in order to reduce her financial stress while serving the people of our state. *See* https://amp.kob.com/articles/4-investigates-review-of-expenses-reveals-governor-spending-most-of-her-discretionary-fund-on-groceries-6016437.html.)

Yet, however sympathetic one might be for the Governor's personal situation, her deliberate disregard for her oath of office and her malicious and illegal mistreatment of Ms. Goodwin can never be excused - and can only be fully remedied by the jury composed of the citizens of our state who will hear this case. Instead of misdirecting her animus toward Ms. Goodwin, the Governor should have insured that Ms. Goodwin and Mr. Moise received equal paychecks, either by accepting, and adjusting upward, NMERB's recommended pay increase for Ms. Goodwin or by unilaterally directing DFA to implement the full pay increase for Ms. Goodwin necessary to eradicate the pay disparity (to include correcting the disparity retroactively to its inception, pursuant to the clear direction of federal and state law). DFA's and RMD's failure to mandate such course-correction was consistent with their silent conspiracy with the Governor and the other Defendants to discriminate against Plaintiff.

<u>All</u> of the women of New Mexico deserve equal pay for their performance of work equal to that performed by men, and the example for that fundamental maxim of workplace equality must be firmly and unequivocally established in our state, if not by the Governor and her co-conspirators and the other named Defendants, then <u>here</u> and <u>now</u> by the citizen-jurors of this state who will be called upon to right this egregious wrong perpetrated against a loyal, hard-working and devoted civil servant who has served our state employees since 1998 and the teachers of our state since 2008 - Plaintiff herein, Jan Goodwin.

**<u>Plaintiff's Excellent Job Performance</u>:**

37.    Finally, the Defendants cannot contend that the pay disparity exists because of any failure of Plaintiff to meet the expectations of her job as the Executive Director of NMERB, because, in her most recent (2020) performance rating issued by the NMERB Board, it is stated:

**<u>Financial Performance</u>**

... Certainly, she [Executive Director Jan Goodwin] continues to exceed performance expectations, despite the way she has been treated [by] the  [ ] NM administration [Defendant Governor Lujan Grisham] to not allow us [the Board] to reward her [Ms. Goodwin] financially at a level she certainly deserves.  She [Ms. Goodwin] performs all these financial tasks exceptionally well.

**<u>Strategic Planning</u>**

... Jan displays an excellent command of the issues we have.  Outstanding.  She always seems to have a Strategic Plan on the books and one in her back pocket when changes need to be made....

**<u>Overall Evaluation Comments</u>**

**... * To find a consistent approach to the salary issue.**

**Need to find a way to address the salary issue for the leadership [Ms. Goodwin] that is consistent and fair...**

[We] place a very high value on her [Ms. Goodwin's] daily efforts as Executive Director of the ERB, and [we] believe that every member of the Board is equally impressed by her daily performance in that capacity.  Jan has a work ethic that is laser-focused to assure that ERB members [public school administration and teachers] get the absolute best return on their life-long investments.

... [T]heir [state fund managers'] combined ability to manage ERB funds, under Jan's leadership is simply outstanding.... [We are] constantly amazed at our quarterly reports that show, in the vast majority of cases, how well our funds have done and how well our investments are positioned.

Additionally, [we] see her [Jan] work tirelessly, yet diplomatically, with sometimes contentious stakeholders, and make concise, yet clear, presentations to numerous legislative committees on behalf of ERB. [We] have the sense that her status among the state legislators with whom she interacts is positive and that they respect her opinion and depth of knowledge on the topics she addresses.

*See* Jan Goodwin's 2020 Evaluation attached as **Exhibit I**.  Emphasis supplied.

38.    Because the Defendants have abjectly failed to correct this illegal pay disparity over the span of Ms. Goodwin's employment with the State of New Mexico as its Executive Director of the State's Educational Retirement Board, serving our state's educational system's employees, Ms. Goodwin has been forced to resign and will be formally constructively terminated as of May 28, 2021, (last day on the payroll) with her last day in the office on March 20, 2021, so that she can assume employment by the State of New Hampshire at a rate of pay comparable to that of Mr. Moise and to which she has been legally entitled and for which she has struggled, without success, to obtain over these many years.

39.    Because Defendants have failed since 2010 to pay Plaintiff the level of compensation that  she was entitled to be paid, even when a lawsuit was filed this year by NMERB against DFA highlighting the pay disparity and challenging the Governor's right to ignore the law - and Governor Lujan Grisham still did nothing to rectify the last ten years of the illegal discrimination which was intentionally perpetrated against this loyal, and valuable, New Mexico public servant, Ms. Goodwin

finally "got the message" that equity for her as an older, white woman would never be forthcoming from our state government.  She was therefore forced to leave her home state and seek equity in another state (New Hampshire), which immediately recognized that Ms. Goodwin's knowledge, experience and history of proven performance would manifest an economic benefit for their employees which would be far, far greater than the cost of her salary - which starting salary amount is almost the same amount as what she should have been paid in New Mexico by these Defendants.

40.     The Defendants' deliberate refusal to keep Ms. Goodwin in New Mexico (by refusing to pay her an amount equal to that paid to her male counterpart) in order to insure the continued economic health of our state's educational retirement system that Ms. Goodwin worked so hard to achieve for our state's educators and administrators, simply makes no economic sense - and, therefore, could only be born from illegal discriminatory prejudice.

41.     As a direct consequence of the illegal misconduct described above, Plaintiff has suffered irreparable harm, to include, but not limited to, loss of income, loss of the use of all unpaid income, loss of PERA retirement benefits, emotional distress and all other recoverable damages, including pre- and post-judgment interest, statutory attorney's fees and the costs of this litigation.

**COUNT I**

**For Violation of the New Mexico Fair Pay for Women Act,**
**NMSA 2016, Section 28-23-1, *et seq*.,**
**(Plaintiff v. Defendants State of New Mexico,**
**The Office of the Governor, DFA, RMD and NMERB)**

42.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

43.     Section 3 of the New Mexico Fair Pay for Women Act (the "Act") provides:

A.      No employer shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in the establishment at a rate less than the rate that the employer pays wages to employees of the opposite sex in the establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility and that are performed under similar working conditions, except [no exceptions apply]...

(*Damages for a violation of this statute include actual and treble damages. See* Section 6(A)(3))

The Act's definition of "employer" extends to the State of New Mexico and its agencies. *See Wolinsky v. New Mexico Corrections Department*, 429 P. 3d 991, 2018 NMCA 71.

**44.     Mr. Moise was deliberately paid at least $100,000.00 per year more than Ms. Goodwin for equal work, in violation of the statute, and such disparity was intentionally never corrected by these Defendants, despite their having clear notice of the illegal disparity.**

45.     As a direct consequence of the illegal misconduct described above, Plaintiff has suffered irreparable harm and damage, to include, but not limited to, loss of income, loss of the use of all unpaid income, loss of PERA retirement benefits, emotional distress and all other recoverable damages, including pre- and post-judgment interest, statutory attorney's fees and the costs of this litigation.

46.     Accordingly, Defendants State of New Mexico, The Office of the Governor, DFA, RMD and NMERB (whether acting independently and/or on behalf of and/or at the direction of the State of New Mexico and/or its Governor) must insure the full compensation of Plaintiff, pursuant to the terms of the Act, for all resultant financial consequences of the disparity, together with treble those damages and Plaintiff's costs and attorneys' fees incurred in the pursuit of this action.

**WHEREFORE**, on Count I, Plaintiff requests that judgment be entered against Defendant State of New Mexico, Defendant The Office of the Governor, Defendant DFA, Defendant RMD and Defendant NMERB, jointly and/or severally, awarding her statutory damages, including treble damages (treble Plaintiff's actual and compensatory damages), together with pre-judgment interest, post-judgment interest, costs, statutory attorneys' fees and such other and further relief as is legally available.

## COUNT II

**For Violation of the Equal Pay Act of 1963, 29 U.S.C., Section 206(d)**
**(Plaintiff v. Defendants State of New Mexico,**
**The Office of the Governor, DFA, RMD and NMERB)**

47.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

48.     Section 206(d) of the Equal Pay Act of 1963 provides:

(d) Prohibition of sex discrimination

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except [no exceptions apply]....

49.     As already stated, Mr. Moise was deliberately paid at least $100,000.00 per year more than Ms. Goodwin for equal work, in violation of the statute, and such disparity was intentionally never corrected by these Defendants, despite clear notice of same.

50.     As a direct consequence of the illegal misconduct described above, Plaintiff has suffered irreparable harm and damage, to include, but not limited to, loss of income, loss of the use

of all unpaid income, loss of PERA retirement benefits, emotional distress and all other recoverable damages, including pre- and post-judgment interest, statutory attorney's fees and the costs of this litigation.

51.     Accordingly, Defendants State of New Mexico, DFA and/or NMERB must fully insure the compensation of Plaintiff, pursuant to the terms of the Equal Pay Act, for all resultant financial consequences of the disparity and for Plaintiff's costs and attorneys' fees.

**WHEREFORE**, on Count II, Plaintiff requests that judgment be entered against Defendants State of New Mexico, The Office of the Governor, DFA, RMD and NMERB, jointly and/or severally, awarding her statutory damages, together with pre-judgment interest, post-judgment interest, costs, statutory attorneys' fees and such other and further relief as is legally available.

### COUNT III

**Gender and/or Race Discrimination and Illegal Retaliation in Violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended;
and the Civil Rights Act of 1991, 42 U.S.C. § 1981a
(Plaintiff v. All Defendants, including Yet-to-be-identified Co-Conspirators)**

52.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

53.     The above-described misconduct conduct perpetrated by the Defendants constitutes age, gender and/or race discrimination, and/or retaliation for Plaintiff's protected complaints, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), as amended ("Title VII of the Civil Rights Act") and the Civil Rights Act of 1991. Defendant Governor Lujan Grisham and all other individual Defendants, at all times relevant herein, were and still are acting under color of state law. All Defendants are therefore jointly and/or severally liable to Plaintiff for all of her

federal civil rights statutory remedies, including for Plaintiff's actual, consequential and punitive damages and attorneys' fees.

54.     Defendants wrongfully and unlawfully discriminated against Plaintiff, a Caucasian woman over 40 years of age, by failing to equally compensate her for the work performed by her which was equal to that of her more-fairly-compensated male peer, Steven Moise.

55.     Because Defendants' ongoing and systemic discrimination and retaliation against Plaintiff violated, and continued to violate, Plaintiff's rights under Title VII of the Civil Rights Act (and the Civil Rights Act of 1991),  Defendants are therefore jointly and/or severally liable to Plaintiff for all of her statutory remedies, including actual, consequential and punitive damages and attorneys' fees.  (The Lilly Ledbetter Fair Pay Act of 2009, 111th Congress Public Law 2, permits Plaintiff to recover from Defendants all income not paid to her since the commencement of the disparity alleged in this Complaint.)

56.     As a direct result of the aforesaid misconduct by the Defendants, Plaintiff has suffered and will continue to suffer embarrassment, humiliation and loss of income and other damages.  Further, as a direct result of the aforesaid misconduct of the Defendants, Plaintiff has been constructively discharged from her employment with the State of New Mexico, has been forced to leave New Mexico, her state of residence, to obtain employment in another state offering equal pay for equal work, has been prevented from obtaining the full enjoyment of life and has sustained loss of earnings, loss of retirement benefits and will continue to incur these and other related damages.

57.     The conduct of the Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiff's

rights and feelings, knowing that their actions or inactions would cause Plaintiff to suffer economic loss and severe and extreme emotional distress, thereby entitling Plaintiff to an additional award of punitive damages to punish Defendants and to deter the State of New Mexico and its Governor(s) and its agency heads (such as Defendant Romero) and any other individual co-conspirators from considering similar reprehensible and illegal misconduct.

58.     Notices of Right to Sue were issued by the United States Department of Justice on April 06, 2021, and on May 14, 2021.  *See* **Exhibits J** and **K** attached hereto and incorporated herein.

**WHEREFORE**, on Count III, Plaintiff requests that judgment be entered against Defendants, jointly and/or severally, awarding her compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

**COUNT IV**

**Violation of The Lilly Ledbetter Fair Pay Act of 2009,
111th Congress Public Law 2
(Plaintiff v. Defendants State of New Mexico,
The Office of the Governor, DFA, RMD and NMERB)**

59.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

60.     The Lilly Ledbetter Fair Pay Act of 2009, 111th Congress Public Law 2, permits Plaintiff to recover from these Defendants all income (and associated loss of benefits and accrued interest) not paid to her since the commencement of the disparity alleged in this Complaint.

61.     This pay disparity began with the commencement of her employment with the State of New Mexico in 2008 and has existed continuously up to the constructive termination of her

employment in 2021; and therefore, Plaintiff is entitled to be compensated by one or more or all of these Defendants, jointly and/or severally, for the full amount of the disparity accumulated since the commencement of her employment as Executive Director of NMERB, to include compensation for all concomitant loss of benefits and accrued interest for the loss of use of such funds, up to and including the date of her termination from employment in 2021, together with statutory attorneys' fees and all associated costs incurred by Plaintiff in rectifying this illegal pay disparity.

62.     The conduct of these Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiff's rights and feelings, knowing that their actions or inactions would cause Plaintiff to suffer economic loss and severe and extreme emotional distress, thereby entitling Plaintiff to an additional award of punitive damages to punish these Defendants and to deter the State of New Mexico and its Governor(s) and its agency heads (such as Defendant Romero) and any other individual co-conspirators from considering similar reprehensible and illegal misconduct.

**WHEREFORE**, on Count IV, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding her compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and  further relief as is legally available.

### COUNT V

**Age Discrimination in Violation of**
**The Age Discrimination in Employment Act of 1967**
**(Plaintiff v. Defendants State of New Mexico,**
**The Office of the Governor, DFA, RMD and NMERB)**

63.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

64.     The Age Discrimination in Employment Act of 1967, 29 U.S.C., Section 621, *et seq.*, prohibits discrimination in the workplace because of age (over 40).

65.     Defendants, by their acts and/or omissions as described above, did so discriminate, in whole or in part, against Plaintiff because she was an older woman (over the age of 40 years old).

66.     Such discrimination resulted in the harm and damage described above, and these Defendants are  therefore liable to Plaintiff therefor and for all of her statutory remedies, to include, but not limited to, an award of her attorneys' fees and costs.

67.     The conduct of these Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiff's rights and feelings, knowing that their actions or inactions would cause Plaintiff to suffer economic loss and severe and extreme emotional distress, thereby entitling Plaintiff to an additional award of punitive damages to punish these Defendants and to deter the State of New Mexico and DFA from considering similar reprehensible and illegal misconduct.

**WHEREFORE**, on Count V, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding her compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

### COUNT VI

**Age, Gender and Race Discrimination and Retaliation in Violation**
**of the New Mexico Human Rights Act, NMSA §28-1-7, *et seq*.**
**(Plaintiff v. All Defendants)**

68.     Plaintiff incorporates and re-alleges all allegations of this Complaint as if fully set forth herein.

33

69.     The New Mexico Human Rights Act, NMSA §28-1-7, *et seq*., makes it an unlawful and discriminatory practice for an employer and its supervisory employees to discriminate in the terms and conditions or privileges of employment because of a person's age, race and/or sex and/or to retaliate against an employee who has made a protected complaint, either individually or through others.

70.     The Defendants had a duty by law not to discriminate against Plaintiff because of her age (over 40) and/or sex (female) and/or race (Caucasian) nor to retaliated against Plaintiff for protected complaints advanced on her behalf.

71.     The Defendants violated this duty, as well as NMSA 1978, §28-1-7, *et seq*., by their aforementioned actions and inactions which created and perpetuated a subliminally toxic and hostile age-discriminating, race-discriminating and gender-discriminating work environment by denying Plaintiff pay and benefits equal to those of her male counterpart, Steven Moise, and by failing to correct such disparity, in part, because of retaliation against Plaintiff for having protected complaints made on her behalf.   At all times referenced herein, the individual Defendants were acting under color of state law.

72.     As a direct result of the aforesaid misconduct of the Defendants, Plaintiff has suffered and will continue to suffer economic loss, embarrassment, emotional distress and suffering, humiliation, loss of her employment in her home state and other consequential damages.   Further, as a direct result of the aforesaid misconduct of the Defendants, Plaintiff has sustained a significant loss of earnings and associated damages and will continue to incur such loss into the future.

73.     The misconduct of the Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiff's

rights and feelings, knowing that their actions or inactions would cause Plaintiff to suffer economic loss and emotional distress, thereby entitling Plaintiff to an additional award of punitive damages to punish Defendants and to deter the Governor of the State of New Mexico and the other individual Defendants from considering the commission of similar reprehensible and illegal misconduct in the future.

**WHEREFORE**, on Count VI, Plaintiff requests that judgment be entered against Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT VII

### Age, Gender and Race Discrimination, Retaliation and Deprivation of Federal and State Rights in Violation of The Civil Rights Act of 1871, Title 42 of The United States Code, Sections 1981a and 1983 (Plaintiff v. All Individual Defendants)

74.     Plaintiff incorporates in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

75.     The individual Defendants (and/or other yet-to-be-identified individuals) engaged in unlawful and intentional age, gender and/or race discrimination and/or illegal retaliation prohibited under 42 U.S.C., Sections 1981a, 1983 and 2000e-2 or 2000e-3, with malice or reckless indifference to the federally protected rights of Plaintiff. In addition, such discrimination violated Plaintiff's rights granted to her pursuant to the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

76.     These individual Defendants (and/or other yet-to-be-identified enabler(s) or co-conspirator(s)) perpetrated such misconduct while acting under color of state law and, in doing so,

35

have deprived Plaintiff of her rights, privileges and/or immunities secured by the United States and New Mexico Constitutions and federal and state laws, including, but not limited to, the federal and state statutes cited herein and the due process and equal protection clauses of the United States and New Mexico Constitutions.

77.     Such violations of 42 U.S.C., Sections 1981a and 1983, have caused Plaintiff to suffer irreparable damage and harm as is described herein, above and below, thus causing these Defendants to be jointly and/or severally liable to Plaintiff for all such resulting harm and damage, entitling the Plaintiff to recover from these Defendants, individually, jointly and/or severally, compensatory and punitive damages.

**WHEREFORE**, on Count VII, Plaintiff requests that judgment be entered against all individual Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT VIII

**Violations of the Due Process and Equal Protection Clauses of the
Fourteenth Amendment to the United States Constitution
(Plaintiff v. Defendants State of New Mexico,
The Office of the Governor, DFA, RMD and NMERB
and Yet-to-be-identified Co-Conspirators)**

78.     Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

79.     The Fourteenth Amendment to the United States Constitution prohibits states from denying its citizens due process or equal protection of the laws.

36

80.     In the instant case, the State of New Mexico and/or The Office of the Governor and/or DFA and/or RMD and/or NMERB and/or Yet-to-be-identified Co-conspirators have deliberately and illegally deprived Plaintiff of due process (failure to permit her to be paid equal pay as received by men for Plaintiff's equal work, notwithstanding the NMERB's attempt to equalize her pay) and equal protection of the laws (failure to provide her with compensation equal to her male counterpart, Steve Moise), which deprivations have caused Plaintiff to suffer the harm described herein.

81.     Accordingly, the State of New Mexico, DFA, RMD, NMERB and/or Yet-to-be-identified Co-conspirators are liable to Plaintiff for all damages she has sustained for this violation of her federal constitutional rights.

**WHEREFORE**, on Count VIII, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT IX

**Violations of the Due Process, Equal Protection and Sex Discrimination
Clauses of the New Mexico Constitution Art. II, § 18
(Plaintiff v. Defendants State of New Mexico,
The Office of the Governor, DFA, RMD and NMERB
and Yet-to-be-identified Co-Conspirators)**

82.     Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

83.     Article II, Section 18, of the New Mexico Constitution prohibits states from denying its citizens due process or equal protection of the laws, to include the prohibition of sex, age and other discrimination.

84.     In the instant case, the State of New Mexico, The Office of the Governor, DFA, RMD and NMERB and Yet-to-be-identified Co-Conspirators have deliberately deprived Plaintiff of due process (failure to permit her to be paid equal pay as received by men for Plaintiff's equal work, notwithstanding the NMERB's attempt to equalize her pay) and equal protection of the laws (failure to provide her with compensation equal to her male counterpart, Steve Moise) guaranteed to Plaintiff under the New Mexico Constitution, as well as discriminated against her in such effort based upon her sex and age (older woman), and such misconduct has caused Plaintiff to suffer the harm and damage described herein.

85.     Accordingly, the State of New Mexico, The Office of the Governor, DFA, RMD, NMERB and Yet-to-be-identified Co-Conspirators, while acting under color of state law, have violated the New Mexico Constitution and are therefore jointly and/or severally liable to Plaintiff for all damages she has sustained for this violation of her state constitutional rights.

**WHEREFORE**, on Count IX, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT X

**Violations of the New Mexico Whistleblower Protection Act,
NMSA 1978, Section 10-16c-1, *et seq*.
(Plaintiff v. Defendants State of New Mexico,
The Office of the Governor, DFA, RMD and NMERB)**

38

86.     Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

87.     The New Mexico Whistleblower Protection Act, NMSA 1978, Section 10-16C-1, *et seq.*, at Section 10-16C-3 provides, in part:

> Section 10-16C-3. Public employee retaliation action prohibited.
>
> A public employer shall not take any retaliatory action against a public employee because the public employee:
>
>> A.   communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act.

88.     The Plaintiff communicated to the State of New Mexico, the Office of the Governor, Defendant Romero, the DFA, RMD and to the NMERB, via one or more state employee(s), including the individual Defendants acting under color of state law, the information set forth in this Complaint about the discriminatory and other illegal acts and failures to act of the named Defendants described herein and of other yet-to-be-identified complicit state employees, which acts and/or failures to act the Plaintiff believed in good faith to be unlawful and/or improper, to include but not limited to, Defendants' failures to respond to the numerous reportings of the unlawful pay disparity being perpetrated against Plaintiff because of the Defendants' illegal failure to afford her equal pay for equal work, including a chain-of command conspiracy to commit same.

89.     These Defendants who are identified to be public employers, either individually or in concert with one or more of the other Defendants and/or with other state employees or agencies (Yet-to-be-identified Co-Conspirators), failed to act to protect the Plaintiff from further income loss in response to the Plaintiff's communications, either made individually through other State officials, to include Mr. Moise or the members of the NMERB Board of Trustees, regarding the Defendants'

respective illegal acts and failures to act described through this complaint, in direction violation of the New Mexico Whistleblower Protection Act.

90.      Such failures to act perpetrated by each and every complicit "public-employer" Defendant have caused the Plaintiff to suffer additional emotional distress and other harm, economic loss, denial or disruption of her employment advancement, constructive termination of her employment, loss of back and front pay, loss of benefits and other actual and consequential damage, and all Defendants are therefore jointly and/or severally liable to Plaintiff for same.

91.      All of the individual Defendants, jointly and/or severally, while acting under color of state law, perpetrated said illegal misconduct on behalf of their respective "employers" intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiff's rights and feelings, thereby rendering the individual Defendants, pursuant to 42 U.S.C., Sections 1981a and 1983, jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

**WHEREFORE** on Count X, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT XI

### Breach of Employment Contact
### (Plaintiff v. Defendants State of New Mexico,
### The Office of the Governor, DFA, RMD and NMERB)

92.      Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

93.     These Defendants, by and through each other and/or by and through other named and complicit Defendants and their perpetration of the aforesaid misconduct against the Plaintiff as is set forth above, breached the covenant of good faith and fair dealing implied in Plaintiff's contract of employment with the State of New Mexico (and/or with NMERB) which was authorized by Defendants The Office of the Governor, DFA, RMD and/or NMERB, thus causing the Plaintiff to suffer emotional distress and other harm, economic loss, constructive termination of her employment, loss of back and front pay, loss of benefits and other actual and consequential damage, and these Defendants are liable to the Plaintiff therefor.

**WHEREFORE** on Count XI, Plaintiff requests that judgment be entered against these Defendants, jointly and/or severally, awarding Plaintiff compensatory and punitive damages where applicable, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such other and further relief as is legally available.

## COUNT XII

### Intentional Interference With Employment Contract
### (Plaintiff v. Defendants State of New Mexico, Lujan-Grisham, Romero, Tyndall, DFA, RMD and NMERB and Yet-to-be-identified Co-Conspirators)

94.     Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

95.     Each and/or all of these named Defendants owed Plaintiff a duty not to interfere with Plaintiff's contract of employment with the State of New Mexico and/or NMERB.

96.     One or more or all of these Defendants breached said duty owed to Plaintiff by engaging in the acts and/or omissions set forth in this Complaint individually and while acting under

41

color of state law, thus rendering one or more or all of them liable to Plaintiff, jointly and/or severally, for all consequent harm suffered by Plaintiff.

97.     One or more or all of these Defendants perpetrated said misconduct intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiff's rights and feelings, therefore rendering these Defendant(s) jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

**WHEREFORE** on Count XII, the Plaintiff prays that judgment be entered against these Defendants, jointly and/or severally, in an amount to be determined by the jury, for costs, back pay, interest, punitive damages and statutory attorneys' fees where applicable and for such other and further relief as is legally available.

## COUNT XIII

### Intentional Infliction of Emotional Distress
### (Plaintiff v. Defendants State of New Mexico, DFA, RMD, NMERB, Lujan-Grisham, Romero, Tyndall and Yet-to-be-identified Co-Conspirators )

98.     Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

99.     By and through the acts and/or omissions described above, one, more and/or all of these Defendant(s), individually or in conspiracy with one or more of each other, intended to and did, in fact, inflict upon Plaintiff severe and extreme emotional distress, for which harm all such culpable Defendant(s) are jointly and/or severally liable to Plaintiff for all of her consequent harm.

100.     One or more or all of these Defendant(s) perpetrated said infliction intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiff's rights and feelings, therefore

rendering the culpable Defendant(s) jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

**WHEREFORE** on Count XIII, the Plaintiff prays that judgment be entered against these Defendants, jointly and/or severally, in an amount to be determined by the jury, for costs, back pay, interest, punitive damages and statutory attorneys' fees where applicable and for such other and further relief as is legally available.

## COUNT XIV

### Negligent/Reckless/Intentional Breach(es) of Fiduciary and Other Duties / Promissory Estoppel
### (Plaintiff v. All Individual Defendants)

101.    Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

102.    One or more or all of the individual Defendant(s) took an oath when assuming their respective offices (Oath of Officer) which is required by the New Mexico Constitution:  "Every person elected or appointed to any office shall, before entering upon his [her] duties take and subscribe to an oath or affirmation that he [she] will support the constitution of the United States and the constitution and laws of this state, and that he will faithfully and impartially discharge the duties of his office to the best of his [her] ability."  The Constitution of the State of New Mexico, Article XX, Section 1.

103.    Such oath was taken by the Governor of the State of New Mexico (Michelle Lujan Grisham) and likely by all individual Defendants when assuming their respective offices, thus creating a fiduciary (or other lawful) duty (to act in the best interest of the citizens of a state - the "duty" to "support the constitution of the United States and the constitution and laws of [New

Mexico" and to "faithfully and impartially discharge [such] duties") owed by each of these Defendants to all citizens of the State of New Mexico, to include Plaintiff herein, to, among other obligations, support and follow the constitution of the United States and the constitution and laws of the State of New Mexico, to include those specific obligations cited throughout this Complaint; yet, as described herein above and below, these individual Defendants, while acting under color of state law in their respective offices, negligently, recklessly and/or intentionally breached such fiduciary duty (and any other duty) owed to Plaintiff and to the citizens of our state by committing the violations cited throughout this Complaint, thus proximately causing harm and injury to Plaintiff and to all New Mexicans, for which harm and injury they are liable to Plaintiff herein.

104.    Even if a Defendant did not take said oath to assume his or her office, nevertheless implied in their assumption of state office and state employment was his or her knowing acceptance of and obligation to comply with and fulfill the duty prescribed by said oath, which duty he or she owed to all citizens of Mew Mexico, including Plaintiff herein.

105.    Such oath of office (and/or the act of assuming office) also constituted a promise made by the individual Defendants to Plaintiff to uphold such duty owed to the citizens of New Mexico, upon which Plaintiff duly relied while engaging in her service to our state, to her ultimate detriment when such promise was breached by the Defendants as has been described hereinabove. Defendants are thereby estopped  from claiming otherwise and are therefore liable to Plaintiff for all of the above-described harm she has suffered as a result of such breach(es) of duty and promise.

106.    One or more or all of these Defendant(s) perpetrated said harm intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiff's rights and feelings while acting

under color of state law, therefore rendering all of the culpable Defendant(s) jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

**WHEREFORE** on Count XIV, the Plaintiff prays that judgment be entered against these Defendants, jointly and/or severally, in an amount to be determined by the jury, for costs, back pay, interest, punitive damages and statutory attorneys' fees where applicable and for such other and further relief as is legally available.

## COUNT XV

### Civil Conspiracy
### (Plaintiff v. All Defendants)

107.    Plaintiff incorporates and re-alleges in this Count all of the allegations made throughout this Complaint as if fully set forth herein.

108.    One or more or all of these Defendant(s) conspired with one or more of the other of these Defendant(s) to discriminate against Plaintiff in the terms and conditions of Plaintiff's employment and to otherwise inflict harm upon Plaintiff via the tortious misconduct described hereinabove.

109.    Such conspiracy has caused Plaintiff to suffer emotional distress and financial harm, for which all of the culpable Defendant(s) are jointly and/or severally liable.

110.    One or more or all of these complicit Defendant(s) perpetrated said conspiracy intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiff's rights and feelings, therefore rendering such Defendant(s) jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

**WHEREFORE**, on Count XV, the Plaintiff prays that judgment be entered against these Defendants, jointly and/or severally, in an amount to be determined by the jury, for costs, back pay,

45

interest, punitive damages where applicable and statutory attorneys' fees and for such other and further relief as is legally available.

## JURY DEMAND

Plaintiff hereby demands that all issues be tried to a jury of six (6) persons.

Respectfully submitted,

THE BENNETT LAW GROUP, LLC

By: _____

Merit Bennett, *Esq.*
460 St. Michael's Drive, Suite 703
Santa Fe, New Mexico 87505
Ph: 505-983-9834 | Fax: 505-983-9836
Email: mb@thebennettlawgroup.com
*Attorney for Plaintiff Jan H.C. Goodwin*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of July, 2021,
I filed the foregoing electronically through the
CM/ECF system, which caused the following parties
or counsel to be served by electronic means, as more
fully reflected on the Notice of Electronic Filing:

Jaclyn M. McLean,
Hinkle Shanor LLP
218 Montezuma
Santa Fe, New Mexico  87501
Ph: (505) 982-4554 | Fax: (505) 982-8623
Email: jmclean@hinklelawfirm.com
*Attorney for Governor Lujan Grisham, The State of New Mexico,*
*The Office of the Governor, DFA, Romero, RMD, Tyndall*

and

46

Luke A. Salganek
Miller Stratvert Law Officse
200 W. De Vargas, Suite 9
P. O Box 1986, 87504-1986
Santa Fe, NM 87501
Ph: (505) 989-9614 | Fax: (505) 989-9857
Email: lsalganek@mstlaw.com
*Attorneys for Defendants ERB et al.*


 /s/ *Merit Bennett*
Merit Bennett, Esq.
*Attorney for Plaintiff*

# JAN H.C. GOODWIN, CPA, MBA

216 Vista Hermosa Street • Santa Fe, NM 87501-1057 • C: 505 412 0083 E: jhcg@cybermesa.com

Award-winning financial and administrative professional with more than two decades of proven experience in senior roles. Responsible for a $13.8 billion pension fund providing benefits for 150,000 members and 218 employers. Career highlights include increasing delinquent tax collections by 178%, lowering state's uninsured driver rate from 32% to 12%, and earning two major awards for career accomplishments, "Outstanding Member in Government," (New Mexico Society of Certified Public Accountants) and "Women to Watch," (American Institute of Certified Public Accountants).

## PROFESSIONAL EXPERIENCE

### NEW MEXICO EDUCATIONAL RETIREMENT BOARD, Santa Fe, New Mexico (2008 – Present)
*Board administers retirement benefits for New Mexico's public educational employees. Provides defined benefit retirement plan for 106,000 active and retired members, and defined contribution retirement plan for 4,000 participants, supported by 73 employees at Santa Fe and Albuquerque locations.*

### EXECUTIVE DIRECTOR
**Accountable for management and administration of $13.8 billion defined benefit pension fund** – for 60,000 active and 46,000 retired members – **and $552 million defined contribution retirement plan;** manage four direct-reports including Deputy Director, General Counsel, Chief Investment Officer and Internal Auditor, reporting to seven-member Board.

Responsibilities include Investment Management, Information Technology, Legal, Member Services, Accounting, Human Resources and Maintenance departments distributing **$1.1 billion in pension benefits annually**, receiving and processing **$698 million in annual employer and employee contributions** from 218 public educational employers, and updating 60,000 active member records.

- **Produced $7.7 million in annual savings and increased internal management of assets from 22% to 32%** – reducing investment management fees, transitioning to internal asset-management strategy, negotiating superior contracts, and using innovative co-investment strategies with alternative assets.
- **Resolved challenges associated with long-term sustainability of defined benefit pension plan;** developed solution supported by stakeholders, obtained legislative and Governor approval, and survived legal challenge, ultimately upheld by State's Supreme Court.
- **Increased productivity and decreased employee turnover by addressing longstanding issue of employees not receiving salary increases.** Implemented non-cash incentive program comprised of "family first" policy, allowing for flexible work hours and extra time for staff to exercise three days weekly.
- **Provide support in implementation of new accounting standards released by Government Accounting Standards Board to participating employers;** compose written materials and presentations to communicate changes over multiple platforms.

### TAXATION & REVENUE DEPARTMENT, Santa Fe, New Mexico (2003 – 2008)
*State agency responsible for collecting and distributing over $7 billion annually in taxes and fees to state and local governments, with approximately 1,200 employees and 60 offices across state.*

### CABINET SECRETARY
**Appointed by Governor; accountable for agency's $84 million operating, capital budgets, and 10 direct-reports.**

During legislative session, **acted as point person for all of Governor's and department's tax legislation; testified before relevant legislative committees; functioned as administration's advocate for legislation** before editorial boards, and advocated for passage of bills.

**Presented department's revenue projections for State's general fund to Finance Committees during legislative sessions** and interim sessions. First Cabinet Secretary in many years to go on-site at all 60 department offices.

- **Reduced average wait time at motor vehicle offices across state – by more than 50% – from 30 minutes to 14 minutes,** by launching strategic, multi-faceted campaign, encouraging public to complete services online via organization's website, installing self-service kiosks in every MVD office, and installing greeters to ensure customers had completed required paperwork to process desired transaction.
- **Oversaw implementation of software for 28 tax programs** replacing former system. The new software is an integrated tax processing system supports the agency's multiple tax programs allowing accurate revenue collection and distribution.
- **Cut state's uninsured driver rate from one of highest in U.S. at 32% to less than national average at 12%** while **boosting vehicle insurance rate from 68% to 88%,** by working with Motor Vehicle Division, state insurance companies, editorial boards of state's major newspapers, law enforcement, and outside advertising company.

**EXHIBIT A**

# JAN H.C. GOODWIN, CPA, MBA

- **Executed new initiative designed to improve delinquent tax collections, collecting total of $395 million or 58% above $250 million baseline.**
- **Improved formerly contentious relationship between State's Tax Department and State Society of Certified Public Accountants** by establishing dedicated customer service line with audit and compliance division (tax practitioner's hotline) and by conducting regular outreach meetings.
- **Eliminated negative reporting condition** existing for more than 15 years; **department's financial statements had qualified audit opinion;** worked with various department employees, outside auditors, and State's Comptroller to develop plan to fix underlying issues.

## STATE BOARD OF FINANCE, Santa Fe, New Mexico (2000 – 2002)

*Provides oversight for many of state's major financial decisions and responsible for severance tax bond and general obligation bond issuance. Board comprised of Governor, Lieutenant Governor, State Treasurer, and four Governor appointees.*

### DIRECTOR

**Administered State's major severance tax bonds and general obligation bond programs;** also directed work of numerous external economists and professionals including attorneys, financial advisors, and economic consultants. **Provided operational and analytical support; coordinated efforts of Deputy Director and Chief Economist in addition to six staff members.**

**Directed research for all matters to be brought before Board** – including such topics as new programs for state universities, major real estate purchases and sales by public entities, major construction contracts for state entities, awarding emergency grant money, and issuing of debt by state agencies and institutions of higher education – **in order to brief all Board members on specifics of each transaction requiring approval** and equipping members to render best decision possible. Briefed all board members on agenda items before each Board meeting.

- **Uncovered unusual patterns of investment transactions** – many of which violated State Treasurer's investment policy – compiled data, analyzed transactions and **forwarded findings to FBI for formal investigation.**
- **Substantially improved process for gathering information contained in State's financial disclosures** by incorporating new checklist procedure to ensure all relevant data were collected and presented. Collaborated with economists and financial advisor to review information in order to identify potential inaccuracies and method to correct errors.
- **Provided oversight to State Treasurer's office responsible for investing $4 billion dollars** including state general fund, bond proceeds and local government investment pool.

## EARLY CAREER

**Deputy Director, State Investment Council, Santa Fe, New Mexico (1998 – 2000)**

Accountable for financial, administrative and information technology functions of agency managing and investing New Mexico's permanent endowment funds, supervised preparation of investment accounting reports for State Investment Council and external clients; established and maintained effective controls to safeguard managed funds.

**Cash Management and Investment Officer, City of Santa Fe, Santa Fe, New Mexico (1996 – 1998)**

Formulated and implemented investment policy for short-term and long-term funds; directed and monitored investment management functions for all city funds; coordinated bond issuance. Staffed Finance Committee meetings for City Council. Monitored and analyzed the City's revenues from taxes (gross receipts, lodgers and property) and fees (water and solid waste).

**Senior Consultant, Summit Equity, Inc., Santa Fe, New Mexico and London, England (1994 – 1996)**

Managed books and maintained records for international management consulting firm.

**Vice President, Investment Analyst/Compliance Officer, Arbor Capital Partners, NY, NY (1993 – 1994)**

Established U.S. Treasury trading desk operations; developed investment strategies for clients, and implemented computer system to record firm's financial and trading transactions.

**Senior Associate, Financial Advisory Services; Supervisor, Personal Financial Services, Coopers & Lybrand, NY, NY (1985 – 1993)**

Provided tax planning and compliance services to high net worth individuals in the financial services industry, and supervised members of mergers and acquisitions buy side due diligence teams.

EXHIBIT A

# JAN H.C. GOODWIN, CPA, MBA

## EDUCATION

**Master of Health Administration, Concentration in General Healthcare Administration**

University of New Mexico, Albuquerque, New Mexico

**Master of Business Administration, Major in Finance and Accounting**

Stern School of Business, New York University, New York, New York

**Bachelor of Arts, Major in Environmental Science**

Wesleyan University, Middletown, Connecticut

## CERTIFICATIONS

Certified Public Accountant and Member, American Institute of Certified Public Accountants
Certified Employee Benefits Specialist, International Foundation of Employee Benefit Plans
Candidate: Yale School of Management – EDHEC-Risk Institute Advanced Risk & Investment Management Program
Information Technology Infrastructure Library (ITIL) Foundation Certification

## PROFESSIONAL ACTIVITIES

Faculty member New Mexico State University EDGE program. Developed and teach pension course (2018 - present)
National Council on Teacher Retirement, Secretary Treasurer, Member of Executive Committee (2016 - present)
Chairperson and Executive Committee Member, Multistate Tax Commission (2005 – 2008)
Second Vice-Chair and Board Member, Federation of Tax Administrators (2003 – 2008)
Adjunct Lecturer, New York University Real Estate Institute Master's Program (1990 – 1992)

## PROFESSIONAL RECOGNITION

"Outstanding Member in Government" Award, New Mexico Society of Certified Public Accountants (2007)
"Women to Watch" Award, Experienced Leader Category, American Institute of Certified Public Accountants (2007)

## COMMUNITY INVOLVEMENT

Member University of New Mexico School of Public Administration Advisory Board (2020 - present)
Board Member, Los Alamos National Laboratory Foundation (2016 - 2019)
Board Member, Chair of Audit Committee, Chair of Investment Committee, SVHSupport (2011 - 2014)
Board Member, Chair of Investment Subcommittee, CHRISTUS St. Vincent Regional Medical Center (2011 - 2014)
State Treasurer Candidate, (2002)
President, Board of Directors, League of Women Voters of Santa Fe County (2000 - 2001)
Treasurer, Board of Directors, Friends of Farmers Markets (1997 - 2001)
Treasurer, Board of Directors, Santa Fe Concert Association (1996 - 2000)

**Comparison of the Service and Performance of the NM State Investment Council
Under Steven Moise Measured Against the Performance of the
NM Educational Retirement Board Under Jan Goodwin**

<u>**New Mexico State Investment Council**</u>

   a)   Mission and structure

New Mexico's State Investment Council (SIC) was created in 1958. The SIC's mission is to "protect and grow the state's permanent endowment funds". Accordingly, the SIC manages the state's two permanent endowment funds: the Land Grant Permanent Fund (LGPF) and the Severance Tax Permanent Fund (STPF) and four other permanent state funds: Tobacco Settlement; Tax Stabilization Reserve; Water Trust; and Rural Libraries Endowment. The SIC also manages the assets for the Early Childhood Education fund and manages $1.5 billion for 23 other New Mexico government entities, for example the New Mexico Retiree Health Care Authority. The SIC is a simple organization that determines the asset allocation for the permanent funds and then hires investment managers to make those investments.

The SIC does not select the asset allocation for the governmental entities for which it manages investments, nor does it manage the assets for each entity separately. Each entity's governing board determines the asset allocation and communicates that to the SIC. The entity's moneys to be invested are then used to purchase what are essentially shares in various mutual funds managed by the SIC's external investment managers, thereby combining the management of investments into commingled accounts.

In order to accomplish its mission, the SIC uses external investment managers who invest in a wide variety of assets. As of June 30, 2020, the SIC was responsible for $27.0 billion in assets. Prior to Steven Moise's tenure with the SIC, which began in April 2010, the SIC used a combination of internal investment managers (SIC employees) and external managers. This model had been in place for a very long time and was very successful. In addition to creating good, well-paying jobs in New Mexico, the model also saved the SIC millions of dollars each year in investment management fees. When Moise started at the SIC, he eliminated all internal management of investments, which increased the costs of management.

   b)   Operations

The LGPF has 21 beneficiaries. These beneficiaries include New Mexico public schools, universities, hospitals and correctional institutions. Every month the SIC makes a distribution to the General Fund for these beneficiaries. The distribution calculations are simple and formulaic. For the year ended June 30, 2020 the distributions totaled $1.01 billion. This reduces the need of the state to fund the operating costs of these beneficiaries. The SIC receives monies each month from these sources: the General Fund for the Tax Stabilization Reserve Fund; the State Land Office and the federal government for the LGPF; and oil and gas emergency school tax from the

**EXHIBIT B**

Department of Finance Administration and the Taxation and Revenue Department for the Tax Stabilization Reserve Fund. The SIC also receives management fees from the 23 government entities for which it manages their investments.

### c) Statutes and Rules

Although the State Investment Officer is responsible for a large portfolio of investments, the actual administration of the SIC is relatively simple. This can be seen by looking at its governing statutes. (Exhibit A- Article 8, page 60, NMSA 1978). The SIC has 25 statutory sections, of which seven have been repealed and the statutes are eleven pages long. The SIC has one administrative rule (six pages) dating from 1990 and it does not appear to have been updated since its initial publication. (Exhibit B- New Mexico State Investment Council Statement of Investment Policy).

### d) Reports and performance

The SIC does not produce an annual report to highlight its financial and investment performance. In 2018, it produced a report to highlight the SIC's sixty years: https://www.sic.state.nm.us/60-years-anniversary-report-2018.aspx The SIC does include quarterly investment performance reports and its annual financial audit reports on its website.

### e) Executive Leadership

When Moise was hired to be the State Investment Officer by the SIC in April 2010, the statute (Section 6-8-4B) required that the person hired as the chief administrative officer for the SIC have at least five years of "investment and executive experience."  Moise did not have any investment experience at the time of his hire. Since then, the statute was changed in 2015 to increase the requirement to "ten years of investment and executive experience". The investment experience at the SIC is provided by the Deputy State Investment Officer, not the prescribed State Investment Officer, whose responsibilities are administrative. Moise oversees a staff of approximately 24 employees. The employees work in areas such as investments, legal, accounting, communications and information technology.

### New Mexico Educational Retirement Board

### a) Mission and structure

In contrast to SIC, the ERB's mission and structure is much more complex. The ERB's mission is "providing secure retirement benefits for New Mexico's educational employees- past, present and future". ERB provides a defined benefit pension to its members. When ERB members retire, they know what their pension will be. It is determined by a formula: Years of service X Final Average Salary X Multiplier. This provides a great deal of financial security in retirement for the members. Members who began their ERB membership before 2013 are also eligible for a cost-of-living adjustment (COLA) at the later age 65 or one year after retirement. Members who began

**EXHIBIT B**

their ERB membership after 2013 are also eligible for a cost-of-living adjustment (COLA) at the later age 67 or one year after retirement.

As of June 30, 2020, ERB has over 163,000 members. Of these, 61,091 were working at 216 different employers across New Mexico, 51,397 were receiving retirement benefits each month totaling $1.1 billion in the year ended June 30, 2020, and 50,914 were inactive (no longer working at an ERB employer and have left their contributions on deposit with ERB. ERB monitors the inactive members to determine when they are eligible to receive pension benefits or allow them to refund their contributions. Each month ERB receives employer and member contributions from 216 public schools, colleges, universities and state agencies totaling $65 million. The records for each of the 61,091 active members are updated monthly to reflect the contributions they have paid and to accrue the service credit they have earned.

ERB's various divisions include: investments, legal, member services, accounting, information technology, communications, and human resources.  The division that is most comparable to the SIC is ERB's investments division.  ERB's investment staff is responsible for pension plan's $14 billion portfolio.  But in contrast to SIC, ERB manages a sizable amount of its portfolio internally. ERB manages approximately 30% of the portfolio with its own staff, saving the retirement fund over $3.6 million each year. In addition, the investment staff engages in other cost-effective management techniques such as co-investing, saving the retirement system over $26 million each year.

Because the ERB's mission and day-to-day business are much more complex than SIC's, the remaining divisions play just as vital a role in agency operations and are explained more in depth below.

b)  Operations

ERB administers retirement benefits for its members. Each year approximately 2,000 members retire. This is a detailed process including preparation of benefit estimates, audit of service history, placement of members on the retiree payroll and verification of final earnings to ensure that the retirement benefit was calculated correctly. If the retirement benefit needs to be adjusted, this must be communicated to the member. All of the retirement benefits must be correctly reported to the federal and state governments. The administration and processing of retiree payroll is a demanding and exacting exercise of coordination amongst ERB's various divisions.

ERB also administers disability benefits to members who qualify, administers a separate defined contribution plan to certain higher educational employees who qualify (the Alternative Retirement Plan), and administers the Qualified Excess Benefit Arrangement, a payment of additional retirement monies to certain highly paid retirees in compliance with the IRS code.  This involves a great deal of coordination among the actuaries and the various higher education institutions who have eligible employees.  In addition, ERB must provide tax information (1099Rs) to all of its 51,000+ retirees every year.

**EXHIBIT B**

Because of the widespread shortage of teachers in New Mexico, ERB also administers a Return to Work program. This program which began in 2004, allows approximately 1,500 retirees each year to earn a salary at an ERB employer, while keeping their pension benefit. These retirees and their employers pay contributions on the retirees' salary to ERB.

ERB's various divisions are vital in providing the important retirement benefit to educational employees. Each must address its own unique set of issues:

*Investments:* responsible for the day-to-day investment of the portfolio. ERB has invested extensively in alternative assets to diversify the portfolio and reduce its risk, adding ten additional asset classes to the investments. The ERB investment portfolio has a very good Sharpe ratio (the measure of an asset compared to its risk) when compared to its peers, both in New Mexico and globally, and is ranked in the top 5th percentile of public defined benefit funds greater than $1 billion over the most recent ten-year period. ERB is the only large New Mexico state agency that manages part of its portfolio with internal staff, saving the ERB a significant amount of external management fees as well as providing important employment opportunities for investment professionals in the State of New Mexico.

*Legal:* responsible for addressing issues such as taxation, proper documentation of investment transactions, preparation of contracts, division of pension benefits governed by Qualified Domestic Relations Orders, and personnel issues.

*Member Services:* helps members understand their benefits, prepares cost estimates for purchases of allowed service credit, prepares benefit estimates for members contemplating retirement, processes refunds of contributions to members, processes retirement applications, process changes in address or bank information for members, processes and distributes monthly retirement benefits, processes Return to Work applications for retirees, and operates the call center to communicate to members any information about their benefits.

*Accounting:* collects and reconciles contributions from 216 employers each month and updates the records for the 61,000 active members each month, processes all invoices and vouchers for the organization, coordinates collection of information for annual financial statement audit, electronically images paper records for all 163,000 members, communicates with employers (schools and universities) in order to receive required information on ERB members and contributions, and performs the Governmental Accounting Standards Board Statement 68 required audit of employer reporting of the employers' proportional share of ERB's unfunded actuarially accrued liability.

*Information Technology:* recently converted to all virtual servers in the cloud (the only state agency to do so), regularly conducts cybersecurity training for all employees, maintains all software and hardware used by employees, and maintains integrity of system through regular penetration testing.

**EXHIBIT B**

*Communications:* prepares and disseminates information regarding proposed legislation; conducts pre-retirement seminars for members nearing retirement; and drafts and implements communications plan.

*Human Resources:* responsible for the recruitment of new employees, onboarding of new employees, processing of payroll for all employees, assists supervisors and managers with disciplinary issues; ensures all required personnel evaluations and paperwork are completed timely.

c) Statutes and Rules

The complexity of the operations of ERB can also be seen in its statutes and rules. ERB has 71 sections in its governing statute, of which five have been repealed. Its statutes span 45 pages. ERB has 12 administrative rules covering topics from eligibility for membership to how members can work in retirement. ERB's rules span approximately 41 pages.

d) Reports and Performance

Beginning with Jan Goodwin's tenure at ERB, each year the accounting staff prepares a Comprehensive Annual Financial Report (CAFR). This includes sections on operating issues and investment performance, ERB's audited financial statements, ERB's actuarial report and general statistics. The report has been submitted each year to the Government Financial Officers Association (GFOA)and has earned its endorsement. The ERB also prepares a summary version of the CAFR, the Popular Annual Financial Report (also submitted for certification to the GFOA), which is distributed to all retires with their Form 1099-R, so they monitor the performance of the ERB retirement fund and be apprised of any significant changes in the Plan.

e) Executive Leadership

Jan Goodwin's responsibilities include administration and operation of the organization, and strategic planning for improved sustainability. The ERB pension plan, like many other educational retirement plans is underfunded. This is the result of chronic underfunding by the legislature. Goodwin has spearheaded a number of legislative efforts to improve the plan's sustainability. The efforts in 2013 and 2019 were done in conjunction with the ERB Stakeholders group, founded by Goodwin. The Stakeholders Group is made up of the five unions that represent ERB members, school systems, community colleges, universities and retirees. Goodwin understood that the best way to make legislative changes happen is to work with those affected by the potential changes to the plan's design and achieve consensus of the changes. After getting the Stakeholder Group to agree to potential changes, Goodwin toured the state in 2012 and 2018, meeting with members to explain why the changes were necessary and gain their support during the upcoming legislative sessions. Both legislative efforts were successful. This resulted in substantive changes to member benefits and contribution in 2013 and 2019, improving the plan's sustainability. This legislative session, Goodwin is working with Senate President Pro Tem Mimi Stewart on SB 42, which increases the employer contribution rate and extends the sunset for the Return to Work

**EXHIBIT B**

program from December 31, 2021 to December 31, 2023.  This legislation, if enacted, will have a substantial positive impact on ERB's sustainability.

Other duties and accomplishments of Jan Goodwin during her tenure as executive director are as follows:

- In 2020, Goodwin commissioned a report by the University of New Mexico's Bureau of Business & Economic Research (BBER) to document and quantify the disparity in the salary and retirement benefits of educational employees (predominantly female) with those of state employees (until recently predominantly male) over time. For many years New Mexico's educational employees knew that their pension benefits were less than those of state employees, but the difference had never been rigorously quantified. The BBER report clearly showed that since the 1950s and continuing through today that ERB members receive hundreds of thousands of dollars less than their counterparts in New Mexico's state government. In fact, the disparity increased with the educational level of the ERB members. One of the reasons Goodwin had this study prepared is to counter any arguments that may come up that ERB members' benefits should be reduced, rather than increase the employer cost (largely paid by the state) in order to improve the plan's sustainability.

- ERB members are also eligible for disability benefits, which ERB administers. Each year there are approximately 20 new or recertification of eligibility for benefits applications. When Goodwin arrived at ERB a panel of local doctors reviewed all of the disability applications. In order to improve the security of confidential member health information and reduce the processing time of disability applications, Goodwin implemented the use of a third-party administrator to review the applications and make determinations. This new process has also significantly decreased the number of members who appeal decisions on the awarding of benefits, reducing appeals that go to the Board.

- During her tenure at ERB, Goodwin has implemented numerous policies to improve sustainability and transparency. In 2013, Goodwin prepared a funding policy for the Board's consideration. The funding policy addressed issues such as actuarial methods to be used and the frequency of asset allocation studies. In addition, in 2017 Goodwin prepared a best practices transparency policy for the Board's consideration. The policy requires the disclosure of investment management fees by asset class, brokerage commissions, details of many other expenses paid by ERB. After ERB adopted this policy, PERA and SIC increased their disclosure of investment management fees.

- ERB is also responsible for administering the Alternative Retirement Plan (ARP), a defined contribution plan that certain employees of higher education may participate in. There are over 4,500 participants in the ARP; their assets total over $750 million. Goodwin supports the Board committee which oversees the third-party administrators for the funds and reviews the allowed investments for the ARP participants.

**EXHIBIT B**

- Goodwin also works closely with the ERB's actuaries to monitor the actuarial metrics of the pension plan and determine if any changes in benefits or assumptions need to be made.

- Goodwin regularly testifies before legislative committees and serves as an expert witness on legislation that affects ERB. ERB's legislative oversight committee is the Investments and Pensions Oversight Committee, which meets during the interim. Over the past few years, Goodwin has presented on topics such as Actuarial Updates, Return to Work, Legislative proposals, legal analysis and constitutionality of altering cost-of-living adjustments, and sustainability, solvency and fund liquidity plans for market downturn.

- Goodwin, because of her position as ERB's Executive Director has also served as an ex officio member on the New Mexico Retiree Health Care Authority. During her thirteen years on the Authority, she has been Chair of the Wellness Committee since its inception and has served as the Chair of the Audit Committee. Goodwin has developed the course materials and taught the Pensions and Other Post-Employment Benefits class for the New Mexico State University's EDGE (Education Designed to Generate excellence in the Public Sector) program since 2018. In addition, Goodwin was invited to join the Executive Committee of the National Council on Teacher Retirement (NCTR) in 2016. NCTR is a member-supported association dedicated to safeguarding the integrity of public retirement systems in the United States. In 2019, Goodwin was elected as the NCTR Treasurer. She now serves as the organization's President Elect.

- Goodwin has also fought tirelessly to improve the compensation for her staff. In 2016, the ERB Board approved a series of salary increases for its professional investment staff. Prior to the Board action, the salaries of the investment staff were in the lowest quartile when compared to those of other similarly sized public pension plans. In 2018, she was able to work out an agreement with Governor Susana Martinez's staff to allow the salary increases to be implemented over a period of three years. The second of the third round of raises were implemented in 2019.

- Goodwin is dedicated to the free flow of information between members and the organization. She implemented a new section on the website in 2020 to "Ask Jan" that provides answers to questions on current issues that members have posed.

- For many years, New Mexico's State Personnel Office (SPO) has limited reimbursement of education expenses for all state employees to coursework that is directly related to the employee's current position. When Goodwin met with the incoming SPO Director Pamela Coleman in 2019, Goodwin asked if employees could be reimbursed for coursework that would benefit the agency, greatly expanding the ability of state employees to be reimbursed for their education and expanding their horizons. SPO made that change later in 2019.

**EXHIBIT B**

- ERB's Board members have a statutory requirement for continuing education on investments or fiduciary topics. Goodwin regularly works with the Board members to identify appropriate educational opportunities. She has also organized training sessions for the Board on actuarial matters and has brought in national experts to provide education for the Board.

- Goodwin initiated the use of an external audit firm (REDW) to conduct internal audits of its operations and investments. This is a separate process from the audit of financial statements by an independent auditor. ERB is responsible for a great deal of confidential information and wants to ensure that all of its information and assets are appropriately safeguarded. In addition, it is important to periodically review all internal processes and procedures to ensure they are being done consistent with their governing statutes and industry best practices.

- Goodwin and her staff members regularly review best practices to continuously improve the system's governance. Best practices do evolve- it's not "set and forget". For example, the best practice theory on who should make investment decisions has evolved. ERB like most other pension plans had a sub-committee of the Board make investment manager hire and fire decisions, as well as portfolio allocation decisions. Portfolio allocation is responsible for over 95% of investment return. In 2020, consistent with the evolution of thinking on who is best equipped to make investment decisions, the ERB voted to allow its staff to make investment manager decisions and report them to the Board. Most governance experts believe that boards should be responsible for setting policy and then oversee staff to ensure that the policies are being implemented correctly.

- In the last few months, ERB has begun a business process improvement (BPI) project in conjunction with getting ready to upgrade its pension administration software (PAS). Upgrading the PAS will allow more functionality for ERB's members, such as being able to print out their Form 1099-R, rather than waiting for it in the mail. The BPI project will identify processes that do not add value and will allow ERB to operate more efficiently for its members.

**The ERB not only has all of the investment duties of the SIC, but has the additional responsibilities for member services, collection of retirement contributions, payment of retirement and disability benefits, as well as working with the legislature and ERB members to keep the ERB retirement plan sustainable.**

**EXHIBIT B**

Senator John Arthur Smith
Chairman

Senator William F. Burt
Senator Pete Campos
Senator Carlos R. Cisneros
Senator Carroll H. Leavell
Senator Howie C. Morales
Senator George K. Munoz
Senator Steven P. Neville

*State of New Mexico*
# LEGISLATIVE FINANCE COMMITTEE

325 Don Gaspar, Suite 101 • Santa Fe, NM 87501
Phone (505) 986-4550 • Fax: (505) 986-4545

David Abbey
Director

Representative Patricia A. Lundstrom
Chair

Representative Paul C. Bandy
Representative Randal S. Crowder
Representative George Dodge, Jr.
Representative Doreen Y. Gallegos
Representative Jimmie C. Hall
Representative Larry A. Larrañaga
Representative Nick L. Salazar
Representative Jim R. Trujillo



August 24, 2018

## LFC INVESTMENT REPORT FOR THE QUARTER ENDING JUNE 30, 2018

This report details the comparative investment performance of the three investment agencies: the Educational Retirement Board (ERB), the Public Employees Retirement Association (PERA), and the State Investment Council (SIC) which manages the land grant permanent fund (LGPF) and the severance tax permanent fund (STPF).[1]

### INVESTMENT PERFORMANCE HIGHLIGHTS

- In FY18, the aggregate value of New Mexico's combined investment holdings for the pension and permanent funds grew by nearly $2.4 billion, or 4.8 percent, to end the fiscal year at $50.8 billion.

- Over the last five years, the state's combined investment holdings grew $11.5 billion, of 29.4 percent.

- One-year returns ranged from 6.9 percent to 8.4 percent. Over the last 10 years, investment returns ranged from 5.5 percent to 6.8 percent.

- ERB and SIC's funds outperformed their long-term targets for the one-, three-, and five-year periods. PERA's fund outperformed its long-term target for the five-year period.[2]

- When compared with peer funds greater than $1 billion on a net-of-fee basis, the ERB fund performed in the highest quartile for the quarter, three-year, and ten-year periods, and it performed above the median for the one-year and five-year periods. The permanent funds performed above the median for the quarter, one-, three-, and five-year periods, and the LGPF performed at the median for the 10-year period. The PERA fund performed in lowest quartile for all periods reported.

Returns as of June 30, 2018 (Net of Fees)[3]

| | PERA | | ERB | | LGPF | | STPF | |
|---|---|---|---|---|---|---|---|---|
| | | Policy | | Policy | | Policy | | Policy |
| Returns (%) | Fund | Index | Fund | Index | Fund | Index | Fund | Index |
| Quarter | 0.80 | 0.98 | 1.50 | 0.90 | 0.85 | 1.00 | 1.67 | 1.03 |
| 1-Year | 6.93 | 5.27 | **8.30** | 8.50 | **8.36** | 7.94 | **8.43** | 8.10 |
| 3-Year | 6.08 | 6.20 | **7.60** | 7.30 | **7.04** | 6.62 | **7.04** | 6.72 |
| 5-Year | **7.31** | 7.34 | **8.10** | 7.60 | **7.93** | 8.00 | **7.90** | 8.06 |
| 10-Year | 5.49 | 5.86 | 6.80 | 6.00 | 6.08 | 6.21 | 5.50 | 6.16 |

Note: bold indicates returns that exceed the fund's long-term target

---

[1] Agency performance and market environment information are derived from the investment performance reports submitted by PERA, ERB, and SIC for the quarter ending June 30, 2018.

[2] The funds' long-term return targets are 7.25 percent (PERA), 7.25 percent (ERB), 7 percent (LGPF), and 6.75 percent (STPF).

[3] A fund's policy index is a custom benchmark that show the returns that would have been generated if a passive investor consistently followed the agency's asset allocation targets according to their investment policy.

**EXHIBIT C**

## Investment Agency Performance Dashboard

Quarter Ending June 30, 2018

This report detail the comparative investment performance of the three investment agencies: the Educational Retirement Board (ERB), the Public Employees Retirement Association (PERA), and the State Investment Council (SIC) which manages the land grant permanent fund (LGPF) and the severance tax permanent fund (STPF).





| Risk Profiles, Five Years Ending 06/30/18, Net of Fees | ERB | PERA | LGPF | STPF |
|---|---|---|---|---|
| Standard Deviation* | 4.6 | 5.8 | 4.0 | 4.1 |
| Sharpe Ratio** | 1.7 | 1.2 | 1.8 | 1.8 |
| Beta*** | 0.4 | 0.5 | 0.5 | 0.5 |

*measures variability from the mean return; higher is more volatile

**higher numbers indicate higher return-to-risk level; a good ratio is 1 or better

***represents the volatility of the portfolio versus the S&P 500. Beta = 1: portfolio moves with the market.  Beta < 1: portfolio is less volatile than market. Beta > 1: portfolio is more volatile than the market.

**Aggregate Value of New Mexico Investment Holdings**

**$50.8 billion**

Source: Agency
Investment Reports

**EXHIBIT C**



# NEW MEXICO
## LEGISLATIVE FINANCE COMMITTEE

# LEGISLATING FOR RESULTS:
# POLICY AND PERFORMANCE ANALYSIS

### Report to the Fifty-Fourth Legislature, Second Session
### VOLUME I

January 2020 for the 2021 Fiscal Year

EXHIBIT D

# Investments



**ERB Total Portfolio Returns as of June 30, 2019**
End Balance $13.329 Billion

Return % — Target 7.25%

Source: ERB



**Finance Facts: Investment Funds**
LFC Online: Understanding Governmental Finances



**PERA Total Portfolio Returns as of June 30, 2019**
End Balance $15.648 Billion

Return % — Target 7.25%

Source: PERA

**D**espite a decline in global equities in the last quarter of 2018, fears of a global slowdown, and trade uncertainties, the state's investment funds posted stable returns in FY19, ranging from 5.37 percent to 7.29 percent. The aggregate value of New Mexico's investment holdings – managed by the Educational Retirement Board (ERB), Public Employees Retirement Association (PERA), and State Investment Council (SIC) – grew by $2.026 billion in FY19.

At the start of FY20, the United States entered into the longest recorded economic expansion in U.S. history. As the expansion continues, investors face challenges of "late cycle" investing, in which returns may be good due to high valuations but risks are also high. Managing investments through a late cycle involves protecting funds from losses in risky assets while also attempting to take advantage of high market returns.

## Performance Overview

In FY19, the aggregate value of the state's investment holdings – comprising the two pension funds managed by ERB and PERA and the land grant and severance tax permanent funds managed by SIC – grew by 4 percent to end the fiscal year at $52.8 billion. Over the last five years, the state's combined investment holdings grew $8.1 billion, or 18.2 percent.

**Asset Values for Year Ending June 30, 2019**
(in millions of dollars)

| Annual | ERB | PERA | LGPF | STPF | Total |
|---|---|---|---|---|---|
| Asset Value | $13,329.1 | $15,648.4 | $18,575.1 | $5,273.6 | $52,826.2 |
| Value Change | $442.9 | $287.7 | $1,121.3 | $174.3 | $2,026.2 |
| Percent Change (year-over-year) | 3.4% | 1.9% | 6.4% | 3.4% | 4.0% |

Note: Percent change includes investment returns, contributions, and distributions.

Source: Investment Agency Reports

Returns for the permanent funds fell short of their long-term investment targets in FY19, which are 7 percent for the land grant permanent fund (LGPF) and 6.75 percent for the severance tax permanent fund (STPF). However, both permanent funds exceeded their targets for the 10-year periods ending in June 30, 2019, each returning at or above 9 percent. PERA's pension fund also fell short of its long-term target of 7.25 percent, returning 6.4 percent in FY19; however, the fund's 10-year return of 9.2 percent exceeds the investment target. The pension fund managed by ERB was the only fund to beat its long-term target in FY19, returning 7.3 percent compared with its long-term target of 7.25 percent.

## Performance Relative to Peers

Analysts use InvestorForce Universe – which evaluates investment fund returns on a net-of-fee basis alongside approximately 60 public funds with $1 billion or more in assets each – to compare investments fund performance with their peers.

**EXHIBIT D**

**Investments**

The ERB pension fund was the only one of the state's investments to perform above the median for all periods reported. PERA performed above the median for the quarter, one-year, and 10-year periods, but ranked below the median for the three- and five-year periods. The permanent funds performed in the lowest quartile for the quarter, but the LGPF outperformed the median in all other periods and the STPF has performed around the median.



InvestorForce Final+ Universe Rankings for Period Ending June 30, 2019
Source: LFC Files



LGPF Total Portfolio Returns as of June 30, 2019
End Balance $18.575 Billion
Source: SIC

Notably, return-based peer rankings do not account for differences in asset allocation and risk tolerance. For example, funds with higher equity exposure will rank higher during stock market rallies but risk significant losses in the event of a market crash. The agencies have each pursued diversifying strategies to mitigate risk, with the understanding diversifying away from heavy stock market exposure means the funds might earn less (and lag their peers) in bull markets in favor of additional stability in moderate or negative return markets.

## Asset Allocations

Less than 50 percent of New Mexico's assets are invested in public equities, like the stock market. About 20 percent of three of the state's four investment funds are allocated to fixed income assets, including bond funds. The exception is ERB, whose assets are more concentrated in alternative investments, such as real estate, real assets, and private equity. Following the Great Recession, the state's investment funds diversified away from heavy public equity allocations in favor of alternative assets that generate solid returns with less risk.



Asset Allocation as of June 30, 2019
Source: LFC Files



STPF Total Portfolio Returns as of June 30, 2019
End Balance $5.273 Billion
Source: SIC



LFC Online: Understanding Government Finances
Finance Facts: Permanent Funds

**EXHIBIT D**



STATE OF NEW MEXICO
*Educational Retirement Board*
701 CAMINO DE LOS MARQUEZ
P.O. Box 26129
SANTA FE, NEW MEXICO 87502-0129
PHONE: (505) 827-8030
FAX: (505) 827-1855

April 25, 2018

The Honorable Duffy Rodriguez
Cabinet Secretary
Office of the Secretary
Department of Finance and Administration
180 Bataan Memorial Building
Santa Fe, NM 87501

Re:  Approval of Actions of Educational Retirement Board of Directors

Dear Secretary Rodriguez:

The Board of Directors of the Educational Retirement Board ["Board"] has directed that I communicate to you as the Secretary of the Department of Finance and Administration ["DFA"].

On December 8, 2017 the Board took action to pass the following motions:

1. **Increase the salary range of the Executive Director, Jan Goodwin to pay range 70 and increase her salary effective December 16, 2017 to $220,000.**

2. **Increase the salary range of the Deputy Director, Rick Scroggins to pay range 46 and increase his salary effective December 16, 2017 to $179,000.**

3. **Increase the salary range of the Chief Investment Officer, Bob Jacksha, to pay range 60 and increase his salary effective December 16, 2017 to $260,000.**

4. **Increase the salary of the General Counsel, Rod Ventura effective December 16, 2017 to $130,000.**

The proper paperwork and submittals to effectuate these salary increases were submitted to DFA on December 21, 2017, but no action has been taken by DFA as of the date of this letter. This most recent failure by DFA to act is not an isolated incident. Since 2016, the Board has approved increases to the salaries of the Executive Director, Deputy Director, Chief Investment Officer and General Counsel. Upon approval of such increases, the proper paperwork was sent to DFA in order that such salary increases be implemented. In addition, in conjunction with the most recent increases, a budget adjustment request ("BAR") was also sent to DFA for implementation on December 21, 2017. This BAR was returned marked "Void. Executive does not support salary increase". To date DFA has failed to implement the salary increases approved

**EXHIBIT E**

Letter to Secretary Duffy Rodriguez
April 25, 2018
Page 2

by the Board, without cause, reason or justification and contrary to both constitutional and statutory imperatives.

The Board is autonomous with respect to its decisions pertaining to the Educational Retirement Fund and its oversight and administration of the Fund, including decisions related to the salaries of the ERB staff and adjustments thereto.   The Board is established through Article XX, Section 22 of the New Mexico Constitution and the Educational Retirement Act, Chapter 22, Article 11, NMSA 1978.  The Constitution grants the Board the "**sole and exclusive fiduciary duty and responsibility** for administration and investment of the trust fund held by their [its] respective system[s]". [Emphasis added].  New Mexico Constitution, Article XX, Section 22. Accordingly, the authority of the Board in regards to administration and investment is not subject to review or objection by any other entity.  Importantly, the fiduciary duty and responsibility over the administration of the trust fund lies solely with the Board and not with DFA. Statutory law directs, "[t]he Board shall. . . [2] hire employees and delegate administrative authority to these employees." Section 22-11-6 NMSA 1978.  Further, the Board has the sole authority to employ an educational retirement director, who is the administrative officer for the board in carrying out the provisions of the Act and shall have additional duties provided for by the Board in regulations. Section 22-11-7 NMSA 1978. In accordance with its authority and responsibility, the Board adopted Rule 2.82.1.13 NMAC, which provides that the director serves "at the pleasure of the board and at a salary set by the board" and with the responsibility for staffing all positions, including the "authority for the employment, promotion and dismissal of all employees." Id.

Neither the Constitution, statutory or case law or regulations grant DFA the authority to refuse, thwart, or fail to implement the decisions of the Board.  Some may try to cite to the DFA's statutory authority over budgets and budgets adjustments of state agencies, Sections 6-3-7 and 6-3-24 NMSA 1978, to argue that DFA may refuse to implement the decisions of the Board; such an attempt is an incorrect overreaching of those sections.  These statutes may provide DFA with authority to approve an overall budget of the agency, but they do not provide DFA with the authority to disapprove salary increases when such increases are within the budget of an agency. More pointedly, DFA does not have the authority to void a BAR because the "Executive does not support salary increase".  State statute provides that the state budget division of DFA "may approve budget adjustments for state agencies as provided by law." Section 6-3-24 NMSA 1978. However, the law does not provide that DFA can substitute its own, or the executive's policy judgment on behalf of ERB.  This is particularly true given the Constitution's grant to the Board of sole and exclusive fiduciary duty and responsibility for the administration of the fund.  New Mexico Constitution, Article XX, Section 22.

Further, ERB is not a state agency nor is it administratively attached to any constitutional officer or state agency or state department over which DFA can exercise any authority. The ERB is an adjunct agency, autonomous with its sole duty and authority and unfettered responsibility for the Fund and to its members.  Although DFA may assert that it has authority or responsibility over the state general fund, the ERB Fund does not rely on general funds for its operation, so any argument endeavoring to justify any DFA authority with respect to the ERB and its Fund fails.

In this regard, the Executive Reorganization Act, Section 9-1-1 to 9-1-10 NMSA 1978 is instructive. Creating a framework for the executive branch of state government, this Act denotes the principal unit of the executive branch as a department, with a secretary as the head of a department. A secretary is appointed by the Governor with the consent of the Senate and serves

**EXHIBIT E**

Letter to Secretary Duffy Rodriguez
April 25, 2018
Page 3

at the pleasure of the Governor.  "Adjunct agencies" are also defined as "[t]hose agencies, boards, commissions, offices of other instrumentalities of the executive branch, not assigned to the elected constitutional officers, which are excluded from any direct or administrative attachment to a department, which retain policymaking and administrative autonomy separate from any other instrumentality of state government.  Elected "constitutional officers" are the governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general and commissioner of public lands.  The ERB is not assigned or attached administratively or otherwise to any elected constitutional officer by constitution or law.  Unlike a department secretary, the director of the ERB serves at the pleasure of the ERB, not the Governor.  There are no statutes that grant any other officer in the executive department, or the executive branch any authority over the employment, promotion or discharge of the ERB director or other ERB staff members.  Accordingly, the Board maintains that any effort by DFA or its employees to veto, undo or override the decisions and actions of the Board on salaries is unlawful and invalid.  Implementation of the Board's decisions and actions, including adjustments to any ERB's employee's salary is a mandatory, non-discretionary duty which may be enforced through a judicial writ.

At this time, the afore-mentioned salary increases for the Executive Director, the Deputy Director, the Chief Investment Officer and General Counsel, which were approved by the Board on December 8, 2017 still await implementation by DFA. These actions were submitted to DFA and remain pending in your office since December 21, 2017.

Please provide us with a status update of these approvals on or before May 24, 2018 so that we may plan accordingly.

I look forward to hearing from you.

Sincerely,

Mary Lou Cameron

Mary Lou Cameron, Chair
Board of Trustees, Educational Retirement Board
P.O. Box 2302
Deming, New Mexico 88031

575-494-2796

**EXHIBIT E**



**STATE OF NEW MEXICO**
*Educational Retirement Board*
701 CAMINO DE LOS MARQUEZ
SANTA FE, NEW MEXICO 87505
P.O. Box 26129 SANTA FE, NEW MEXICO 87502-0129
PHONE: (505) 827-8030
FAX: (505) 827-1855

June 1, 2018

Ms. Betty Garcia
Exempt Pay Plan Administrator
DFA State Budget Division

Re: New Mexico Educational Retirement Board Executive Director Reclassification and Increase

Dear Ms. Garcia,

The New Mexico Educational Retirement Board at its May 24, 2018 meeting voted to increase the salary range of the Executive Director, Jan Goodwin to pay range 70 and increase her salary effective May 26, 2018 to $240,000 annually.

Thank you for your attention to this action by the Board. Please don't hesitate to contact me if you have any questions concerning these actions. I can be reached by phone at (575) 492- 2796 or by email at mlcameron48@gmail.com

Sincerely

*Mary Lou Cameron*

Mary Lou Cameron
New Mexico Educational Retirement Board Chairperson

**EXHIBIT E**

# PERSONNEL / POSITION ACTION REQUEST FORM

| Business Unit: 35200 | Current Posn. #: 00003204 | Proposed Posn. #: |
|---|---|---|
| Empl. Name: Jan Goodwin | | Empl. ID: 100568 |

## Personnel Data

| Personnel Action: Pay Rate Change attached memo | | Reason (Required): see | | Effective Date: 5/26/2018 |
|---|---|---|---|---|
| DOB: | Gender: | | Highest Education Level: | |
| Marital Status: | | As of (Date): | | SSN:   - - |
| Home Address: City: | State: | Zip Code: | | County: |
| Home Phone: (   )   -   ext. | | E-mail: | | Ethnicity: |
| Military Status: | | Expected Job End Date: | | Officer Code: |
| Task Group: 352000001 | | Task Profile: 352000001 | | Pay Group: GVX |
| Current Hourly Rate: $ 79.129046 | | Proposed Rate: $ 115.384615 | | Annual. Salary: $ 240,000.00 |
| FICA: Subject | FTE: 1 | Retirement Plan: SPLAN3 | Comments: | |

## Current Position Data

| Position Title: Exec Dir Investments/Pensions | | Effective Date: 5/29/2010 |
|---|---|---|
| Supervisory: Yes | Job Code: 7387 | Reg/Temp: REG/PERM |
| Full/Part: Full Time | Union Code: NN | Short Title (0-99): 1 |
| Department: Office of the Director, 1000000000 | Location: SF-701 Camino de los Marquez, 995-082084 | Reports To Posn. : |
| Supervisor Level: A | FLSA Status: Executive | End Date: |

## Proposed Position Data

| Position Action: Reclassify | Other (If Applicable): | |
|---|---|---|
| Position Title: Senior Investment Officer (Executive Director) | | Effective Date: 5/26/2018 |
| Supervisory: | Job Code: 7710 | Reg/Temp: |
| Full/Part: | Union Code: | Short Title (0-99): |
| Department: | Location: | Reports To Posn. : |
| Supervisor Level: | FLSA Status: | End Date: |
| Does this Position Require a BAR? Yes | Please Document All Position Changes Here: Reclassifying from Exec Dir Investments/Pensions (42) to Senior Investment Officer (70) | |

Patrick Herrera        5-31-18    476-6142    Patrick.herrera @state.nm.us
Name of employee who completed this form    Date    Phone    E-Mail

## Approvals

| Educational Retirement Board | 6/1/18 | Rick Scroggins | 6/1/18 |
|---|---|---|---|
| Agency Origin | Date | Agency/Admin Approval | Date |
| DFA GOVEX Administrator | Date | DFA Budget Division | Date |

**EXHIBIT F**

| | | | |
|---|---|---|---|
| SPD/GOV Office Approval | Date | DEA Approval | Date |

**EXHIBIT F**

## Goodwin, Jan, ERB

| | |
|---|---|
| **From:** | Mark Baker <mbaker@peiferlaw.com> |
| **Sent:** | Sunday, November 29, 2020 9:09 AM |
| **To:** | Goodwin, Jan, ERB; Ventura, Roderick, ERB |
| **Subject:** | [EXT] FW: ERB Issue |
| **Attachments:** | 4-25-18--letter to DFA-- final v2.pdf |

FYI.

-----Original Message-----
From: Mark Baker
Sent: Sunday, November 29, 2020 9:08 AM
To: matt.garcia@state.nm.us
Subject: ERB Issue

Matt,

Thanks for making time to talk Tuesday.  Here's the letter ERB previously sent laying out the general legal argument for its authority to set salaries for staff.  I appreciate you being straight-up in telling me I'm not likely to get movement on this, but I think the discussion is worthwhile.  I view the ERB's status as a constitutionally-created board with an independent fiduciary duty to administer the educational retirement fund, along with the fact that everyone is paid through ERB funds rather than general fund money, as compelling reasons to look at this differently than other salary determinations.

From a more practical standpoint, the Board's requests have been aimed at bringing professional staff salaries closer to the median for similar funds across the country.  Given the need to recruit people qualified to administer the fund in a manner that fulfills the Board's fiduciary obligations, they need flexibility outside the salary determinations the governor makes for other state agencies.  I also see some disparities across the State's three major funds -- SIC, PERA, and ERB, that warrant scrutiny.

We can go through it Tuesday and see where things stand.

Mark

Mark T. Baker
Peifer, Hanson, Mullins & Baker, P.A.
Post Office Box 25245
Albuquerque, New Mexico 87125
Tel: (505) 247-4800
Fax: (505) 243-6458

**EXHIBIT G**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
2/22/2021 11:26 AM
KATHLEEN VIGIL CLERK OF THE COURT
Faith Griego

STATE OF NEW MEXICO

COUNTY OF SANTA FE

FIRST JUDICIAL DISTRICT

Case No. D-101-CV-2021-00353

Case assigned to Mathew, Francis J.

NEW MEXICO EDUCATIONAL RETIREMENT
BOARD,

      Plaintiff,

vs.

DEBBIE ROMERO, in her official capacity as
Acting Secretary of the New Mexico Department
of Finance and Administration, AND THE NEW
MEXICO DEPARTMENT OF FINANCE AND
ADMINISTRATION,

      Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff New Mexico Educational Retirement Board ("NMERB"), by its attorneys,

Peifer, Hanson, Mullins, & Baker, P.A., for its Complaint for Declaratory Judgment against

Defendants Debbie Romero and the New Mexico Department of Finance and Administration

(collectively "DFA") states:

## NATURE OF THE CASE

1.      Under Article XX, Section 22 of the New Mexico Constitution, the NMERB has

the "sole and exclusive fiduciary duty and responsibility for administration and investment of the

trust fund" it oversees – the Educational Retirement Fund, which holds and invests more than

$14 billion for the benefit of New Mexico public school and higher education institution faculty

and staff, and other education officials.  NMERB brings this action to stop ongoing interference

**EXHIBIT H**

by DFA in decisions the NMERB Board of Trustees (the "Board") has made regarding the

compensation of professional staff necessary to fulfill the Board's constitutional obligations.

## PARTIES, JURISDICTION, AND VENUE

2.      NMERB is constitutionally established through Article XX, Section 22 of the

New Mexico Constitution and statutorily governed by the Educational Retirement Act, Chapter

22, Article 11, NMSA 1978.  NMERB is not a cabinet department nor is it administratively

attached to any constitutional officer or state agency or department over which DFA can exercise

authority.

3.      DFA provides fiscal oversight to New Mexico state general funds, agencies, and

local governments and may exercise only those powers expressly conferred by statute.

4.      This Court has jurisdiction over the parties and subject matter under NMSA 1978,

§ 44-6-2 (declaratory judgment), and N.M. Const. art. VI, § 13 (district courts).

5.      Venue is proper in this court pursuant to NMSA 1978, § 38-3-1(A).

## GENERAL ALLEGATIONS

6.      Management of NMERB is vested in the Board, which is composed of seven

members.

7.      The Board stands in a fiduciary relationship to the members covered under the

Educational Retirement Act.

8.      The Board is required by statute to hire staff and delegate administrative authority

to these staff.

9.      The Board's ability to pay competitive salaries necessary to attract and hire staff

capable of making decisions related to the NMERB's $14 billion fund is both inherent in its

fiduciary obligations and essential to fulfilling those obligations.

**EXHIBIT H**

10.     The NMERB is responsible for investing the Educational Retirement Fund for the benefit of over 163,400 current and former employees of New Mexico's public school systems and higher education institutions, and other education officials.

11.     NMERB must compensate professional staff at competitive levels given the size of the fund, the sophistication required to competently manage and invest it, and national competition in the public and private sector for individuals qualified to do this work.  The Board has determined that remaining competitive in that market is essential, and that it cannot be competitive if salaries are limited based on other considerations such as the compensation the state pays in other areas of New Mexico government that are not impacted by the same competitive market for a limited pool of candidates qualified to manage billions of dollars in retirement funds.

12.     Administrative management of the fund is vested in a Director appointed by the Board.

13.     The Board has the sole authority to employ the Director, who is the administrative officer for the Board charged with carrying out the provisions of the Educational Retirement Act and who has additional duties provided for by regulation.   Moreover, the Legislature has specified that "[t]he amount of salaries and fees to be paid by the board shall be fixed by the regulations of the board."  NMSA 1978, § 22-11-10(A).

14.     In accordance with its authority and responsibility, the Board adopted regulations providing that the Director serves "at the pleasure of the board and at a salary to be set by the board" and with the responsibility for staffing all positions including the authority for the employment, promotion, and dismissal of all staff. 2.82.1.13 NMAC.

**EXHIBIT H**

15.     NMERB does not rely on state general funds for its operation, including payment of salaries. All salaries for NMERB staff are paid using NMERB funds.

16.     Beginning in 2016, the Board more closely evaluated the compensation NMERB paid to professionals it employs as staff.  That led the Board to conclude it needed to increase pay in order to fulfill its constitutionally imposed fiduciary responsibilities.  In particular, the Board established a plan in June 2016 designed to bring compensation for staff closer to the median compensation paid by comparable public pension funds across the country as determined based on national data compiled by McLagan, a respected source of compensation data for professionals.

17.     When the Board began that process, the McLagan study showed that salaries for NMERB professional staff were in the bottom quartile for comparably-sized public pension funds.

18.     The Board voted to change the classification of certain investment staff professionals from classified to exempt and raise their salaries over a three-year period.    The Board likewise voted to increase the salaries of the Executive Director and the Deputy Director over the same three-year period.

19.     DFA undermined the Board's plans to ensure the NMERB paid salaries necessary to retain and recruit staff qualified to fulfill the Board's fiduciary obligations.

20.     Between June 24, 2016, and November 13, 2020, DFA refused to implement a long series of Board-approved salaries for 13 NMERB staff members.  The first two years of salary increases for some but not all investment staff professionals were implemented in 2018 and 2019, and DFA refused the final year of proposed increases for investment staff outright. DFA also refused to implement Board-approved salary increases for all other staff.

**EXHIBIT H**

21.     NMERB provided all proper paperwork and submittals to DFA to effectuate the salary increases the Board approved.

22.     In conjunction with the December 2017 Board approved salary increases, NMERB sent a budget adjustment request ("BAR") to DFA for implementation on December 21, 2017.  This BAR was returned marked "Void. Executive does not support salary increase."

23.     On April 25, 2018, the Board Chair, Mary Lou Cameron, advised Cabinet Secretary Dorothy Rodriguez that DFA unlawfully refused to implement the Board approved salaries, but still DFA did nothing.

24.     As a result of DFA's actions, the Board has lost critical personnel and the opportunity to hire candidates qualified for other positions, and NMERB staff morale has suffered.

### Professional Staff Member 1

25.     On June 24, 2016, the Board approved a raise for Professional Staff Member 1 effective that same date.  DFA's refusal to implement this Board-approved salary resulted in Professional Staff Member 1 being underpaid by $19,997.48 between June 24, 2016, and June 30, 2017.

26.     The Board approved a second raise for Professional Staff Member 1, effective July 1, 2017.  DFA's refusal to implement this Board-approved salary resulted in Professional Staff Member 1 being underpaid by $18,031.57 between July 1, 2017, and December 15, 2017.

27.     On December 8, 2017, the Board approved a raise for Professional Staff Member 1, effective December 16, 2017.  DFA's refusal to implement this Board-approved salary resulted in Professional Staff Member 1 being underpaid by $26,075.59 between December 16, 2017, and May 26, 2018.

**EXHIBIT H**

28.     On May 24, 2018, the Board approved a raise for Professional Staff Member 1, effective May 26, 2018.  DFA did not approve that salary increase and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 1 being underpaid by $57,727.85 between May 26, 2018 and June 1, 2019.

29.     DFA's failure to implement the Board approved salary increases for Professional Staff Member 1 resulted in Professional Staff Member 1 being underpaid by a total of $121,832.48.

### *Professional Staff Member 2*

30.     On December 8, 2017, the Board approved a raise for Professional Staff Member 2, effective December 16, 2017.  DFA's refusal to implement this Board-approved salary resulted in Professional Staff Member 2 being underpaid by $9,932.57 between December 16, 2017, and May 26, 2018.

31.     On May 24, 2018, the Board approved a raise for Professional Staff Member 2, effective May 26, 2018.  DFA did not approve the raise and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 2 being underpaid by $18,864.53 between July 14, 2018, and July 13, 2019.

32.     On June 19, 2020, the Board approved a raise for Professional Staff Member 2, effective that same day.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 2 being underpaid by $34,494.22 between June 19, 2020, and November 13, 2020.

33.     DFA's failure to implement Board-approved salary increases for Professional Staff Member 2 resulted in Professional Staff Member 2 being underpaid by a total of $63,291.32.

**EXHIBIT H**

*Professional Staff Member 3*

34.     On June 24, 2016, the Board approved a raise for Professional Staff Member 3 effective the same day.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 3 being underpaid by $11,597.71 between June 24, 2016, and December 9, 2016.

35.     On December 9, 2016, the Board again voted to approve the same salary increase. Based on DFA's historical failures to approve salaries, the Board made this raise effective upon DFA approval, which never happened.

36.     On December 8, 2017, the Board approved a raise for Professional Staff Member 3, effective December 16, 2017.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 3 being underpaid by $24,508.97 between December 16, 2017, and May 26, 2018.

37.     On May 24, 2018, the Board approved a raise for Professional Staff Member 3, effective May 26, 2018.  DFA did not approve the raise and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 3 being underpaid by $166,589.65 between May 26, 2108, and November 13, 2020.

38.     DFA's failure to implement Board approved salary increases for Professional Staff Member 3 resulted in Professional Staff Member 3 being underpaid by a total of $202,696.33.

39.     Having served in New Mexico government with distinction for decades, Professional Staff Member 3 was prepared to take a higher-paying position with a public retirement fund outside New Mexico in March 2016.  When the Board learned that Professional Staff Member 3 was being recruited for that position, Board members secured Professional Staff

**EXHIBIT H**

Member 3's agreement to remain at NMERB based on assurances that the Board would take care of the compensation discrepancy.

### *Professional Staff Member 4*

40.     On June 23, 2017, the Board approved a raise for Professional Staff Member 4 effective the same day.  DFA's failure to implement the Board-approved salary increase resulted in Professional Staff Member 4 being underpaid by $9,203.30 between June 23, 2017, and May 24, 2018.

41.     On May 24, 2018, the Board approved a raise for Professional Staff Member 4 effective May 26, 2018.  DFA did not approve the raise and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 4 being underpaid by $9,538.46 between May 26, 2018, and December 1, 2018.

42.     On June 28, 2019, the Board approved a raise for Professional Staff Member 4 effective July 13, 2019.  DFA did not approve the raise and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff Member 4 being underpaid by $26,131.36 between June 28, 2019 and November 13, 2020.

43.     DFA's failure to implement the Board approved salary increases resulted in Professional Staff Member 4 being underpaid by a total of $44,873.12.

44.     In January 2021, Professional Staff Member 4 resigned from NMERB in favor of a higher paying position elsewhere.

### *Professional Staff Member 5*

45.     Professional Staff Member 5 already was working for NMERB when the Board sought to adopt two simultaneous changes to Professional Staff Member 5's status in July 2019.

**EXHIBIT H**

That involved both changing the position Professional Staff Member 5 held to exempt from classified and increasing Professional Staff Member 5's salary.

46.     On June 28, 2019, the Board approved Professional Staff Member 5's raise, effective July 13, 2019.  DFA did not approve the raise and instead limited it.  DFA's refusal to implement the Board-approved salary resulted in Professional Staff 5 being underpaid by $17,410.99 between July 13, 2019 and June 30, 2020.

47.     This imposed on Professional Staff Member 5 dual hardships – losing the protection of being a classified employee *and* being denied the benefit of the raise the Board approved.

48.      On June 30, 2020, Professional Staff Member 5 resigned in favor of a higher paying position with another public entity in New Mexico.

49.     NMERB has not been able to fill Professional Staff Member 5's position since June 30, 2020, and has consequently been without an employee to perform Professional Staff Member 5's essential functions.

50.     In seeking to fill this critical position for NMERB, the Board proposed offering a qualified candidate a specific salary of $125,000.  DFA again refused to approve, and the candidate declined the limited salary NMERB was able to offer.

### *Professional Staff Member 6*

51.     On June 28, 2019, the Board approved a salary increase for Professional Staff Member 6, effective July 13, 2019.  DFA did not approve the raise.  DFA's refusal to implement the Board approved salary increase resulted in Professional Staff Member 6 being underpaid by $35,627.14 between July 13, 2019 and November 13, 2020.

**EXHIBIT H**

*Investment Professionals*

52.     DFA similarly blocked Board-approved salary increases for investment professionals that the Board had approved In June 2016.  As with the professional staff mentioned in the preceding paragraphs, the Board had approved raises for investment professionals to be implemented over a three-year period beginning in 2016, and DFA refused to implement the increase that was set to be effective April 4, 2020.

53.     These raises also were part of the plan to bring NMERB staff pay closer to the median for equivalent funds nationally, and the investment professionals also had their positions changed from classified to exempt as part of that process.

54.     DFA's refusal to implement the Board-approved raises resulted in underpayments for investment professionals of $24,731.04, $16,291.87, $12,775.99, $9,409.83, $8,932.74, $6,294.97, and of $2,487.15 for each impacted investment professional respectively.

55.     The New Mexico Constitution, New Mexico statutes, case law and regulations do not grant DFA the authority to refuse, thwart, or fail to implement the Board's decisions.

56.     DFA's role is strictly ministerial in implementing salary determinations made by the Board.

57.     The Governor's role with NMERB is limited to appointing members to the Board. The Governor has the statutory authority to appoint two members to the Board for terms of four years each.  In addition, the Governor's appointed Secretary of the Public Education Department or that person's designee also serves on the Board.

58.     The Governor does not have authority to interfere with the Board's fiduciary obligations, including the Board's determinations regarding appropriate salaries to pay NMERB staff.  As a result, DFA never should have submitted NMERB salary increases to the Governor's

**EXHIBIT H**

office for approval, and directives from the Governor's office related to NMERB staff compensation are not a basis for changing Board-approved decisions.

## COUNT I: DECLARATORY JUDGMENT

59.      NMERB re-alleges and incorporates by reference all preceding paragraphs as if fully set forth.

60.      A justiciable controversy exists between NMERB and Defendants because Defendants refuse to implement salaries NMERB has approved in its sole constitutional and statutory discretion to implement salaries for NMERB staff.

61.      Plaintiff NMERB contends it is an adjunct agency, autonomous with its sole duty and authority and sole responsibility for the fund and to its members.

62.      Plaintiff NMERB contends that pursuant to this responsibility, the Board has sole and exclusive authority to set salaries and make personnel decisions related to NMERB and using NMERB funds.

63.      Defendants' actions indicate that they wrongly insist DFA has the authority to reject Board-approved salary increases and also may or must seek the Governor's approval to implement Board-approved salary increases.

64.      The relief requested herein will terminate the controversy or remove the uncertainty regarding this dispute.

65.      This action is brought pursuant to the provisions of the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to - 15.

WHEREFORE, Plaintiff NMERB, prays as follows:

**EXHIBIT H**

A.    For a Judgment declaring that the Board of Trustees of Plaintiff NMERB has sole

and exclusive authority to set salaries and make personnel decisions related to the

NMERB.

B.    For a Judgment declaring the rights, duties and obligations of all parties hereto

and matters herein.

For such other further and different relief as the Court may deem just and proper.

Respectfully submitted,

PEIFER, HANSON, MULLINS & BAKER, P.A.

By: /s/ Mark T. Baker
      Mark T. Baker
      Rebekah A. Gallegos
Post Office Box 25245
Albuquerque, NM  87125-5245
Tel:    505-247-4800
Email:  mbaker@peiferlaw.com
           regallegos@peiferlaw.com

*Attorneys for New Mexico Educational Retirement Board*

**EXHIBIT H**

**2020 EVALUATION**

**JAN GOODWIN**

**NM ERB EXECUTIVE DIRECTOR**

1. **Financial Performance**

   4, 4.5, 4,4.5. 5

   Comments:  Overall this goal is being addressed.

   Certainly, she continues to exceed performance expectations, despite the way she has been treated the previous NM administration to not allow us to reward her financially at a level she certainly deserves.  She performs all these financial tasks exceptionally well.

2. **Leadership**

   4, 4.5, 5, 4.5, 5

   Comments:  High salaries for investment officer with lower salaries for staff such as lower executive staff; Overall, this goal is being addressed; Jan is a very effective leader; Certainly, exceeds expectations to outstanding.  Jan's leadership is quiet, informed, but never overbearing. She speaks clearly and answers questions in a precise, positive, and understandable manner.

3. **Organizational Development**

   4.5, 5.0, 5.0,5.0, 5

   Comments: Very good job! Outstanding.  Jan is one of the best organized people I have ever met, which allows her to juggle all these balls/tasks in a nearly flawless manner.

4. **Public Relations**

   4.0, 4.0, (no basis for evaluation); 5;4.5

   Outstanding in my opinion.  I often imagine myself in her position dealing with contentious legislators and stakeholders and uninformed media personnel trying to create a new Headline.  I could not do what she does in maintaining her "cool" and always acting and responding in a most professional manner to represent ERB in the most positive way possible.  We are never embarrassed by how she responds to all constituents or how she is quoted in the lay press.

5. **Personal and Professional Development**

   4.5, 5.0, (no basis for evaluation), 5, 5

   This is an area of strength.  Unable to evaluate.  I do not know about these kinds of activities in which she may participate, nor do I know what the industry standards may be.

6. **Strategic Planning**

   4.5,4.5, 5, 5, 5

   Overall, this goal is being addressed; however, the Board does not spend near enough time looking at how to do a better jo addressing the strategic plan.

**EXHIBIT I**

Jan displays an excellent command of the issues we have. Outstanding. She always seems to have a Strategic Plan on the books and one in her back pocket when changes need to be made. She keeps the plans fluid.

### 7. Board Relations

4.5, 4.5, 5, 5,4.5

Overall, this goal is being addressed. Outstanding in every respect.

### 8. Overall Evaluation Comments

*Progress on Current Board Recommended Objectives for Improving Performance as Executive Director:

Organized. Members sometimes find her not sensitive to their needs.

*Executive Director should continue to address the public perceptions of ERB:

1. How NMERB listens to its constituents? Teachers, Public Schools, substitutes, etc.
2. How NMERB addresses controversial issues?
3. How NMERB addresses public confidence in the fund, especially as the economy struggles with the pandemic.
   This area continues to be a weak link in the system.

*To find a consistent approach to the salary issue.

Need to find a way to address the salary issue for the leadership that is consistent and fair. Board also needs to be aware of how staff is being compensated.

*To continue to communicate with new legislators.

In 2021, we have more new legislators than normal. There is a need to continue to reach out to new Legislators and help them to understand ERB and pensions.

I place a very high value on her daily efforts as Executive Director of the ERB, and I believe that every member of the Board is equally impressed by her Daily performance in that capacity. Jan has a work ethic that is laser-focused to assure that ERB members get the absolute best return on their life-long investments.

Working closely with Bob Jacksha, our Chief Investment Officer, and Alan Myers, our Accounting and Operations Manager, their combined ability to manage ERB funds, under Jan's leadership is simply outstanding. I mention this because under their scrutiny our invested funds constantly seem to outperform other comparable funds and they achieve these results while simultaneously suppressing the decision to invest in more risky investments. I am constantly amazed at our quarterly reports that show, in the vast majority of cases, how well our funds have done and how well our investments are positioned.

**EXHIBIT I**

Additionally, I see her work tirelessly, yet diplomatically, with sometimes contentious stakeholders, and make concise, yet clear, presentations to numerous legislative committees on behalf of ERB. I have the sense that her status among the state legislators with whom she interacts is positive and that they respect her opinion and depth of knowledge on the topics she addresses.

**EXHIBIT I**

**Jan Goodwin Goals for 2020-2021**

1. Develop contact with new legislators in the 2021 session to help them understand the work and impact of the ERB in providing retirement benefits to all New Mexico educational employees.
2. Develop and implement a plan to educate members, at different stages of their career, about the importance and value of their defined benefit retirement plan and what the benefit constitutes.
3. Continue to educate the governor and/or staff, key legislators and ERB stakeholders about the importance of improving ERB's sustainability. Continue to provide and develop evidence on the need to increase the employer contribution rate as shown in the BBER report on the disparity in benefits between ERB members and state employees.
4. Continue communication with all Board members when situations arise that may cause legislative/public scrutiny.
5. Continue to expand use of social media for communicating with ERB members, legislators and the public.

**EXHIBIT I**

**2020 NM ERB Executive Director Self Evaluation**

**Executive Director's Name:  Jan Goodwin**

**Date:**

# Rating Key
5 = Outstanding Performance
4 = Exceeds Performance Expectations
3 = Meets Performance Expectations
2 = Requires Minor Improvements to Meet Performance Expectations
1 = Requires Significant Improvement to Meet Performance Expectations

# AREA OF REVIEW

### 1. Financial Performance
   *Monitors the performance of the portfolio.
   *Ensures contributions and income are invested in accordance with the established Board policies.
   *Recommends investment policy and operational procedures that will enhance the investment program of the NM ERB.
   *Ensures that proper internal controls are developed to safeguard the assets of the system.

**Executive Director Self-Rating for Financial Performance: 4.8**
**Comments:**
Consistent with the balance of my tenure at ERB, I regularly confer with Bob Jacksha, ERB's Chief Investment Officer, on our portfolio's investment performance and our adherence to the Board's policies on investments. I have worked closely with Bob to implement the pay structure the Board approved for the Investment staff in 2016, which included changing the status of professional investment staff from classified to exempt and increasing their salary over a three-year period so it would be closer to median of other similar-sized US public pension plans. After extensive discussions with Governor Martinez's staff, the first phase of salary increases and the classification of the professional staff from classified to exempt took place in April 2018. The second phase of salary increases were implemented in April 2019. To date, the Lujan Grisham administration has not implemented the third and final phase of salary increases for the professional investment staff.
Our investment performance continues to be strong relative to our peers and our policy index. For example, in calendar year 2018, ERB was one of only three US public pension plans to have a positive net return for the year. In addition, for the ten years ended June 30, 2019, ERB's out performance was $1.35 billion, compared to our policy index. At the same time, we have been able to lower our volatility and increase our Sharpe ratio. ERB continues to be the only large New Mexico state investing agency that manages assets internally. We continue to use other cost-effective strategies such as co-investing. In total, these strategies save us approximately $71 million per year and contribute to our strong performance. The Legislative Finance Committee commented favorably on our

**EXHIBIT I**

strong performance in its January 2020 policy and performance analysis of all state agencies, noting that "ERB was the only fund to beat its long-term target in FY19" and that "The ERB pension fund was the only one of the state's …[investment agencies] to perform above median for all periods reported".

We continue to use the model for transparent financial reporting that I developed in 2016. This model was the basis for Senate Bill 2 in the 2017 legislative session, which proposed extending the reporting model to the State Investment Council, the Public Employees Retirement Association and the State Treasurer's Office. Although the bill passed both houses, Governor Martinez vetoed it.

We continue to use the services of REDW for internal audit work. Since August 2018 they have provided us with eight reports focusing on these issues: enterprise risk management; benefit payments and refunds; service credit; investment management selection; census data; information technology; and governance.

## 2. Leadership

    *Initiates, establishes, and implements policies, procedures, and standards for the system operation.

    *Plans, organizes, and administers all program areas for which the system is statutorily responsible.

    *Manages system in cost effective manner.

**Executive Director Self-Rating for Leadership: 5**
**Comments:**

During the summer of 2018, I worked with our Stakeholder Group to develop legislation to improve ERB's sustainability for the 2019 legislative session. The Stakeholder Group consists of the unions that represent ERB members (NEA, AFT, ATF, AFSCME and CWA), ERB employers and retirees.  The proposal, which was approved by the Board in December 2018, included a tiered multiplier for new hires (to end the subsidy for members with short ERB careers), requirement for all retirees working for ERB employers and their employers to pay contributions, requirement for all PERA retirees working for ERB employers to pay contributions, requirement that all substitute teachers working more than 0.25 FTE and their employers to pay contributions, and an increase in the employer contribution. The bill was successful, with the exception of the employer contribution increase. The legislation decreased ERB's funding period from 70 years to 47 years.

I continued work with the Stakeholder Group in the summer of 2019 to develop a new proposal for the Board's consideration to present to the 2020 legislative session. Although the Board endorsed the proposal, the legislature and the Governor chose to address PERA's insolvency issues, which they considered more pressing.

One of the challenges of getting the legislature and the Governor to focus on ERB is that we are not facing a crisis. In addition, for decades the ERB members have paid more for their retirement benefits and have received lower retirement benefits than state employees. At the same time, the employer contribution rate for state employees has been consistently higher than that for ERB employees. I have worked with our actuaries to prepare graphs to demonstrate these points and to show how the burden of changes and contribution increases have been borne by active members, retirees and the state. To further buttress these points and demonstrate to the Governor and the legislature that the only change we need is to increase the employer contribution, ERB entered into a

**EXHIBIT I**

contract with the University of New Mexico's Bureau of Business & Economic Research (BBER) to show how over time our members have paid more in retirement contributions and have received significantly less in retirement benefits. The Director of BBER, Jeffrey Mitchell, presented his preliminary report to the Board at its June meeting. His final report will be ready soon and will be distributed to the Board. The BBER contract also includes presentations to the Governor and a legislative committee. I will also present the report to the Stakeholders Group later this summer.

Bob Jacksha and I regularly discuss how to manage ERB in a cost-effective manner, consistent with our duties as fiduciaries. In November 2017, we ended our contracts with external managers for US mid and small cap equity managers as active management of these asset classes was not cost effective. We are now managing these assets internally in a passive S&P 400 index fund.

Last summer and fall after extensive discussions with the Board and ERB legal staff the Board adopted a divestment policy. The Board's policy recognizes that the Board's primary responsibility is the administration of retirement benefits, rather than structuring the investment portfolio in the furtherance of social goals. This has been, and will continue to be, a very contentious issue for some of our members.

I continue to participate on the board of the New Mexico Retiree Health Care Authority (RHCA). ERB's Executive director is an ex officio member of that board. I continue to serve as the Chair of the Wellness and Audit Committees. I also serve on the Finance and Legislative Committees. Unlike ERB, RHCA has a solvency issue and I regularly stress the importance of improving sustainability and reaching 100% funding.

We have directed our actuaries to develop two calculators for our members. The first calculator helps members decide if they should participate in ERB's Return to Work program, which expires at the end of calendar year 2021. ERB retirees have the option to suspend their retirement and earn additional service credit if they go back to work. For most retirees, unless they work for more than 11 years, they are better off suspending retirement and retiring with a higher pension when they stop working. The second calculator helps retirees who are younger than age 55 decide if they should retire by July 1, 2021 to participate in RHCA's subsidized health insurance coverage. Beginning July 1, 2021 retirees will have to be 55 or older to eligible for RHCA coverage. The actuaries are working with our retirement software provider to integrate the calculators into our website. I anticipate that the calculators will be available in the next month or two. I have already arranged with NEA and AFT for their members to help us with usability testing.

### 3. Organizational Development
 *Directs, supervises, and ensures completion of functions and activities of all administrative staff.

 *Assumes responsibility for the development or approval of all program changes, work methods and procedures.

 *Confers with managers regarding program development and revision.

 *Directs development of budgetary requests for the system for review and approval by the Board.

 *Establishes and maintains effective relationships with administrative staff of other agencies, employee organizations, consultants, state officials, members, and the public at large.

 *Ensures that proper internal controls are developed and implemented to keep the operation of the system functioning successfully.

**EXHIBIT I**

**Executive Director Self-Rating for Organizational Development: 4.8**
**Comments:**

The last few months have been challenging because of the global pandemic. Nevertheless, we have continued to pay all retirement benefits on time to our retirees. We transitioned all staff, with very few exceptions, to working remotely in a matter of days by working with administrative staff and our Information Technology group to ensure that our staff have the equipment they need to work effectively from home. With the gradual reopening of New Mexico, we started the transition back to the office for some of our staff. We are following the Governor's guidance for retail establishments and keep occupancy at all of our offices to 25% or less.

We continue to develop and expand our staff. When Rick Scroggins announced his retirement as Deputy Director at the end of 2018, I promoted Rod Ventura to take on that role. Rod has successfully made the transition from General Counsel to Deputy Director. At the same time, I promoted Susanne Roubidoux from Deputy General Counsel to General Counsel. Susanne is executing her new role very effectively. Recognizing the importance of communications to all of our efforts, we recently created the new position of Communications Director and hired Mariana La Roche to perform those duties. In the short time that Mariana has been at ERB, she has organized a webinar for July 1 retirees and is helping with our efforts to launch our new website. In addition, we hired a new Human Resources Director, Charlene Zalma, after Patrick Herrera decided to pursue another opportunity within state government. Charlene hit the ground running and has helped us restructure our agency so it is more efficient.

We continue to make good progress on our project we began two years ago to find and correct data on our inactive members- our data cleanse project. As part of this project, we find and correct personal information of long inactive members. Having this data will assist us to be in compliance with Internal Revenue Service requirements for minimum distributions. This is a common issue for many pension plans as many members when they leave their jobs do not provide their pension plan with current address information. As a pension plan serving educational employees, I believe that education and professional development of our staff is important. In 2019, we worked with the incoming Director of the State Personnel Office (SPO) to change the SPO rule on what types of courses state agencies can reimburse their employees for. Until that time, employees could only be reimbursed for classes that are directly related to their current job. In December 2019, SPO changed its rule so that employees can be reimbursed for any class that would benefit their agency. In order to show our employees that I support their coursework, at the beginning of every semester I give each employee enrolled in a class a gift card from Starbucks (purchased with my own funds) to help with their studying.

Cybersecurity issues continue to be top of mind. We continue to have cybersecurity insurance protection in place. Our Information Technology staff continue regular testing of our staff to ensure their continued diligence of these threats. We are exploring locating all of our servers in the cloud, to better protect them. In addition, this year we joined Shared Assessments, a group of IT professionals from a wide variety of industries, including retirement plans, who share best practices on issues such as dealing with the risks posed by third parties that we work with, e.g. actuaries and software developers.

After ten years of continued effort, we finally received legislative approval to build a new office building in Santa Fe. We outgrew our Santa Fe building many years ago and had to find new rental offices in Santa Fe for our investment staff. With our new building, we will finally have physical space for the internship program that I have not been able to

**EXHIBIT I**

pursue for lack of space to house additional staff. I have long believed that ERB should host as many interns as possible to expose New Mexico students to job opportunities in investments, IT, and accounting.

This past year I have also worked with the Public Education Department and the Superintendents Association on how to address the shortage of substitute and regular teachers in New Mexico. We made suggestions to help with demand (allow teachers to be paid out for unused sick leave) and supply (have school districts hire teachers to work exclusively as substitutes).

### 4. Public Relations
  *Represents the system by attending meetings of various organizations.
  *Participates in activities of local, state, and national organizations engaged in activities related to the system's operations.
  *Maintains effective relations with members of the legislative and executive branches.
  *Makes recommendations to the executive and legislature branches concerning system programs activities.
  *Testifies before legislative bodies to promote ERB endorsed legislation.
  *Advises legislative committees on matters relating to ERB fund.
  *Maintains appropriate media relations.

**Executive Director's Self-Rating for Public Relations: 4.8**
**Comments:**

Since my August 2018 performance evaluation, I have represented ERB before many organizations. The topics of my presentations include, but are not limited to, the importance of sustainability for ERB, ERB's economic impact, Governmental Accounting Standards Board Statement 68, ERB operations, proposed legislation and the impacts of enacted legislation. The organizations include: Public Education Department Spring Budget Workshop; Department of Finance and Administration; Legislative Finance Committee staff; Governor's office (Martinez and Lujan Grisham administrations); University of New Mexico Retirees; Council of University Presidents; New Mexico Association of School Budget Officers; New Mexico State University's Education Designed to Generate Excellence in the Public Sector (EDGE); and the ERB Stakeholders group.

Meetings regarding ERB general operations, including financial transparency, ERB's economic impact, ERB's sustainability, proposed and enacted legislation have taken place with the Legislative Finance Committee, Investments and Pensions Oversight Committee, and the Legislative Education Study Committee. I have also presented our budget to the Legislative Finance Committee, the House Appropriations and Finance Committee, and to the Senate Finance Committee. In addition, I conducted an orientation session in February 2019 for incoming members of the House of Representatives. Immediately after Michelle Lujan Grisham was elected governor, I reached out to her staff to brief them on ERB's efforts to improve sustainability. I also met with her Chief of Staff John Bingaman about the importance of improving sustainability. After the onset of the pandemic related economic downturn, I worked with Bob Jacksha to develop a presentation on pension obligation bonds because low interest rate environments are the ideal time to issue these securities. We presented these materials to John Bingaman, the Department of Finance & Administration Cabinet Secretary, and the Director of the

**EXHIBIT I**

Legislative Finance Committee. We will continue education efforts on this during the interim legislative session.

We continue to work on our relationship with the state's major newspapers: the Albuquerque Journal and the Santa Fe New Mexican. I saw that they were using insolvency (inability to pay obligations when due) and sustainability (ability to pay benefits and reach 100% funding within a reasonable length of time) interchangeably. I developed a glossary of basic actuarial terms for them and they have found it quite useful. We continue to send them press releases on investment performance and they regularly publish articles on our performance.

Beginning with the 2019 legislative session, we developed a social media presence. We continued this practice during the 2020 legislative session. Mariana La Roche will use her extensive experience in this area to publicize our efforts and engage our members.

We continue to use our website as our primary connection with our members. Often rumors circulate in the education community about ERB. Most recently members were concerned that because of the state's fiscal situation, the legislature would "raid" the ERB trust fund. We now have an Ask Jan feature on our website to respond to rumors or questions our members have. We took a hiatus on our newsletter when our Outreach Director left for a different opportunity within state government. We used the vacancy to rethink how we want to conduct outreach and communications. It took us several months to have the State Personnel Office and the Department of Finance & Administration to approve our plan and hire our new Communications Director. We are now in the process of hiring an outreach director. In the meantime, we have also created a Communications Unit to better communicate with all constituencies of ERB- active members, retirees, employers, legislators, media and other stakeholders.

Internal communications is a never-ending process. We continue to have a weekly newsletter to update employees on agency operations, based on our weekly management meetings. Once the majority of our staff began working from home, I have emailed a daily update to all our staff. In addition to the news (if any) I include a newspaper article on how to deal with the pandemic and its related uncertainty. I have received a great deal of positive feedback from staff on these updates.

I have continued my involvement with the two main public pension organizations: the National Association of State Retirement Administrators (NASRA) and the National Council on Teacher Retirement (NCTR). In October 2017, I was selected to be a member of the NCTR Executive Committee, their governing body. At the NCTR annual conference in October 2019, I was elected as the Secretary/Treasurer of NCTR.

### 5. Personal and Professional Development
   *Active in public fund/investment community.
   *Attends conferences and other professional development opportunities to keep abreast of changes in retirement plans and investment strategies.

### Executive Director's Self-Rating for Personal and Professional Development:
### Comments: 4.5
With my professional certifications as a Certified Public Accountant and a Certified Employee Benefit Specialist, I am required to take many hours of continuing professional education each year. I always endeavor to take coursework that is directly related to my work. For example, this year I earned a certificate in cybersecurity from the American Institute of Certified Public Accountants. I also regularly attend NASRA and NCTR

**EXHIBIT I**

conferences as they both provide high quality education and an opportunity to discuss current issues with my peers from other retirement systems.

Other retirement systems face the same challenges that confront ERB. I ensure that ERB maintains contacts and memberships with organizations that champion defined benefit public pension plans. These organizations include NASRA, NCTR, the National Institute for Retirement Security and the National Conference on Public Employee Retirement Systems. Because ERB also administers a defined contribution plan, the Alternative Retirement Plan, we now participate in the National Association of Government Defined Contribution Administrators, which has a good information network and provides quality training.

In the summer of 2018, the NMSU EDGE program asked me to develop content for and teach a class on pensions and other post-employment benefits for their students. The first session was in August 2018 and the next session will be this August. Their March session was canceled due to the pandemic.

In January 2020, I was asked to be a member of UNM's School of Public Administration's Advisory group. The group will meet quarterly. We were supposed to meet in March, but the session was postponed due to the pandemic.

### 6. Strategic Planning
  *Provides leadership to Board in development of plan design changes, investment strategies, and policy development.

**Executive Director's Self-Rating for Strategic Planning:** 4.8
**Comments:**
This April our actuaries presented their experience study, based on our June 30, 2019 valuation report. Experience studies provide the Board the opportunity to review all of the important assumptions that support our actuarial valuations and make adjustment, if necessary. In the past we had done experience studies every two years, but with the advice of our actuaries have changed this to every three years. The industry best practice is to conduct an experience every five years; however, we have chosen to conduct them more frequently to identify any changes that need to be made as soon as possible.

By lowering our inflation assumption from 2.5% to 2.3%, the Board also chose to lower our investment return assumption from 7.25% to 7%. This has increased our funding period from 47 years to 70 years. In the 2020 legislature, all of the revenue raisers that were included in the Board's 2019 legislation were eliminated. We will try to get these re-enacted because they are also important for equity reasons: all work in retirement should be subject to contributions and all substitute teachers should be treated the same. Governor Lujan Grisham has said that addressing ERB's sustainability will be a priority for the 2021 session. We will provide her with the BBER report and other materials that we have prepared that show that our members and retirees have borne the burden of prior efforts to improve sustainability and the only needed reform is to increase the employer contribution rate.

Bob Jacksha and I continue to work closely to identify cost effective investment strategies for our portfolio. We have also worked on how to better streamline the operations group that supports our investment staff. We sent the reorganization paperwork to the State Personnel Office so we can make the necessary change to increase efficiency and accuracy in our communications and reconciliations with our custody bank. As noted earlier, we are now internally managing mid- and small cap stocks.

**EXHIBIT I**

As mentioned above, we have gone to the legislature in 2019 and 2020 to seek increases in the employer contribution rate. In addition, with the sunsetting of the Return to Work statute at the end of 2021, we have been proactive in quantifying that it is not financially rewarding for the vast majority of our members to participate in the Return to Work program. We will be publicizing the calculator prepared by our actuaries so members can see that for themselves and make the best decision on whether to suspend their retirement or participate in Return to Work. This should help in resolving the thorny political issues surrounding Return to Work.

## 7. Board Relations

   *Prepares and/or directs the preparation of written reports for Board approval related to all activities in the proper discharge of the Board's fiduciary duties.

   *Apprises and advises the Board on financial, economic, operational, and political developments.

   *Participates in projecting the actuarial solvency of the system and future costs of various retirement provisions.

   *With the recommendations of legal counsel and ERB management, composes proposals for rule changes to the ERB as needed.

**Executive Director's Self-Rating for Board Relations: 4.8**
**Comments:**
Consistent with the balance of my tenure at ERB, I keep the Board up to date on public pension matters by sending relevant news articles on a weekly basis as well as the presentations I make to legislative committees. At Board meetings, my staff and I present information on ERB projects and operations to keep the Board informed about our activities as well as financial, economic and political developments that affect ERB and our members. We have continued to improve the depth of knowledge that the Board receives to improve their understanding of our staff's work through staff presentations on their area.

We regularly review our statutes to see how they can be improved. During the 2019 legislative session, we worked with Senator Steinborn to change our statutes so that members who pass away without naming a beneficiary can have their retirement benefit go to their spouse or domestic partner. This bill passed both houses and was signed by the Governor.

As in prior years, I continue to communicate regularly with actuaries, fiduciary and tax counsel, investment consultants and auditors to ensure that I am aware of pending regulatory changes and emerging trends that may affect ERB and its long-term sustainability. These professionals brief the Board and its committees, as appropriate. I continue to take a proactive approach on these matters, rather than wait and to be asked why we have not taken action. I have taken a consistently proactive stance on improving sustainability by working with our consultants to prepare evidence on why our preferred method, increasing employer contributions, is the best way to proceed.

All Board members are required to take 8 hours of training per year. Because Board members have widely varying schedules and time constraints, I always try to provide a wide variety of ways for Board members to fulfill their statutory requirements.

## 8. Overall Evaluation

EXHIBIT I

**Please provide a short narrative on each Board objective from last evaluation for Improving Performance as Executive Director:**

1. *To continue to strengthen communications with the media, constituents, and legislators.*
   As noted earlier, I developed an actuarial glossary so reporters can have a better understanding of actuarial terms when they report on pension matters.
   We are now using social media (Facebook and Twitter) to keep our members apprised of ERB legislation and current events. We are in the process of launching a new website to serve as a resource for our members and constituents.
   I continue to work closely with legislators and their staff to keep them informed about ERB.

2. *To continue to strengthen and create a more positive public perception of ERB.*
   I do this in all of my interactions with members, legislators and the public by being honest, prepared, ready to admit what I don't know and will follow up with the answer, and acting with integrity and in the best interests of ERB and our members.

3. *A written report of key activities to Board members at each Board meeting.*
   I include a detailed report of agency activities, organized by functional group, in each Board packet.

4. *Develop a strong public relations campaign on the economic benefits of ERB and the strengths of a defined benefit retirement plan.*
   We have focused this communication effort on our members and legislators. We continue to include articles in our newsletter on ERB's economic impact and the importance of participating in a defined benefit retirement plan. We also include economic impact information in our Popular Annual Financial Report (PAFR), a very brief summary of our Comprehensive Annual Financial Report. County level GDP data became available last December, so we will be able to provide this information to the legislature during this year's interim session. The importance and cost-effectiveness of defined benefit pension plans is also included in the orientation presentation for new legislators.
   Our soon to be launched website will have a resource section with articles from multiple sources on the cost-effectiveness and benefits of participating in a defined benefit pension plan.

**EXHIBIT I**

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

April 06, 2021

Ms. Jan H.C. Goodwin
c/o Merit Bennett, Esquire
The Bennett Law Group
460 St. Michel's Drive
Suite 703
Santa Fe, NM  87505

Re:  EEOC Charge Against State of New Mexico, Dept. of Finance & Administration
   No. 543202100368

Dear Ms. Goodwin:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Albuquerque District Office, Albuquerque, NM.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,

                         Pamela S. Karlan
                         Principal Deputy Assistant Attorney General
                         Civil Rights Division

                    by       /s/ Karen L. Ferguson
                         Karen L. Ferguson
                         Supervisory Civil Rights Analyst
                         Employment Litigation Section

cc: Albuquerque District Office, EEOC
   State of New Mexico, Dept. of Finance & Administration

**EXHIBIT J**

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 14, 2021

Ms. Jan H. Goodwin
c/o Merit Bennett, Esquire
The Bennett Law Group
460 St. Michael's Drive
Suite 703
Santa Fe, NM  87505

Re:  EEOC Charge Against State of New Mexico, Risk Management Division, et al.
    No. 543202100483

Dear Ms. Goodwin:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Albuquerque District Office, Albuquerque, NM.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                Sincerely,

                Pamela S. Karlan
                Principal Deputy Assistant Attorney General
                Civil Rights Division

        by      /s/ Karen L. Ferguson
                Karen L. Ferguson
                Supervisory Civil Rights Analyst
                Employment Litigation Section

cc: Albuquerque District Office, EEOC
   State of New Mexico, Risk Management Division, et al.

**EXHIBIT J**

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 14, 2021

Ms. Jan H. Goodwin
c/o Merit Bennett, Esquire
The Bennett Law Group
460 St. Michael's Drive
Suite 703
Santa Fe, NM  87505

Re:  EEOC Charge Against New Mexico Educational Retirement Board, et al.
    No. 543202100484

Dear Ms. Goodwin:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Albuquerque District Office, Albuquerque, NM.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                    Sincerely,

                    Pamela S. Karlan
                    Principal Deputy Assistant Attorney General
                    Civil Rights Division

            by      /s/ Karen L. Ferguson
                    Karen L. Ferguson
                    Supervisory Civil Rights Analyst
                    Employment Litigation Section

cc: Albuquerque District Office, EEOC
   New Mexico Educational Retirement Board, et al.

**EXHIBIT J**

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 14, 2021

Ms. Jan H. Goodwin
c/o Merit Bennett, Esquire
The Bennett Law Group
460 St. Michael's Drive
Suite 703
Santa Fe, NM  87505

Re:  EEOC Charge Against Office of the Governor of New Mexico, et al.
   No. 543202100485

Dear Ms. Goodwin:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Albuquerque District Office, Albuquerque, NM.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

          Sincerely,

          Pamela S. Karlan
          Principal Deputy Assistant Attorney General
          Civil Rights Division

    by    /s/ Karen L. Ferguson
          Karen L. Ferguson
          Supervisory Civil Rights Analyst
          Employment Litigation Section

cc: Albuquerque District Office, EEOC
  Office of the Governor of New Mexico, et al.

**EXHIBIT J**